25 C.C.P.A.(Customs)
### GEORGE E. WARREN CORPORATION v. UNITED STATES.
Customs Appeal No. 4101.

Court of Customs and Patent Appeals.
March 28, 1938.

Curtis & Belknap, of New York City (James F. Curtis, of New York City, of counsel), for appellant.

Joseph R. Jackson, Asst. Atty. Gen. (Charles D. Lawrence, Sp. Asst. to Atty. Gen., and Marcus Higginbotham, Jr., and Ralph Folks, Sp. Attys., both of New York City, of counsel), for the United States.

McLanahan, Merritt & Ingraham, of New York City (Walter Gordon Merritt and Robert R. Bruce, both of New York City, of counsel), amici curiæ.

Before BLAND, Acting Presiding Judge, and HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Presiding Judge.

We have here an appeal from the judgment of the United States Customs Court, First Division, overruling two protests (the cases having been consolidated for trial) by appellant against the assessment and collection by the Collector of Customs at the port of Boston, Massachusetts, of certain taxes upon coal imported from the Union of Soviet Socialist Republics which we shall hereinafter usually refer to as Russia.

The entries involved were made, respectively, on January 8, 1936, and March 5, 1936. So far as the Tariff Act of 1930 as originally enacted is involved, the coal concededly was entitled to free entry. Paragraph 1650, section 201, Tariff Act of 1930, 19 U.S.C.A. § 1201, par. 1650. The collector, however, assessed and collected a tax, or duty, of 10 cents per 100 pounds, acting under the provisions of section 601 [1] of the Internal Revenue Act of 1932, as extended by Ch. 90, Sec. 212, 48 Stat. 206, and Ch. 333, 49 Id. 431.

There is no claim that the balance of trade in coal, coke or briquettes between the United States and Russia during 1935, the year preceding the importations, was favorable to the United States, but, for reasons later to be stated, appellant relies, at least in part, upon the language in section 601 (a), supra, reading "unless treaty provisions of the United States otherwise provide."

In the brief on behalf of appellant, the issues are summarized as follows:

"There are no facts in dispute.

"The only questions presented are those of law as to, first, the effect of the Trade Agreements Act or Reciprocal Tariff Act of June 12, 1934, in extending most-favored-nation treatment to all nondiscriminating countries when such most-favored-nation treatment is granted to some coun-

---

[1] "Sec. 601. Excise Taxes on Certain Articles.

"(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

"(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such act, except that—

\* \* \* \* \* \*

"(c) There is hereby imposed upon the following articles \* \* \* imported into the United States, a tax at the rates hereinafter set forth \* \* \*.

"(5) Coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom; and coal or coke briquettes, 10 cents per 100 pounds. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles, and shall not be imposed upon any such article if during the preceding calendar year the exports of the articles described in this paragraph from the United States to the country from which such article is imported have been greater in quantity than the imports into the United States from such country of the articles described in this paragraph." 26 U.S.C.A. § 1420 et seq. note.

try under the terms of the trade agreement with it; second, the effect of the President's proclamations extending various trade agreement benefits specifically to the Soviet Union by name; third, the effect of the agreement entered into between the Governments of the United States and the Soviet Union in extending such benefits to goods manufactured or produced in the latter country; and fourth, the change in the taxable status of coal from other countries resulting from the trade agreement between the United States and the Netherlands, under the terms of which coal and coke were specifically granted entry into this country free of the tax imposed by Section 601 of the Revenue Act of 1932."

The Act of June 12, 1934 (Ch. 474, 48 Stat. 943, 19 U.S.C.A. §§ 1351–1354), is in the form of an amendment, adding new matter to Title III of the Tariff Act of 1930.[2]

The substance of its parts here pertinent may be summarized as follows:

The President is authorized, for a limited time, to enter into trade agreements with foreign countries or instrumentalities thereof, and to proclaim modifications of existing duties and other import restric-

---

[2] The here pertinent portions of the Act of June 12, 1934, read:

"Part III—Promotion of Foreign Trade—

"[Sec. 350]. (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: Provided, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

"(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: Provided, That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon.

"(c) As used in this section, the term 'duties and other import restrictions' includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports." 19 U.S.C.A. § 1351.

.tions to conform with such agreements, such proclaimed duties and other import restrictions to apply to articles the growth, produce or manufacture of all foreign countries, whether imported directly or indirectly. No proclamation may be made "increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and ·free lists." Another provision is that the term "duties and other import restrictions," as used in the amendatory act, "includes (1) rate and form of import duties ·and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports." Other provisions, not here of importance, authorize the President to suspend the proclaimed duties under conditions defined, and to terminate any proclamation in whole or in part. Also, a special provision is made with respect to the treaty of· commercial reciprocity concluded between the United States and Cuba, December 11, 1902, 33 Stat. 2136.

Up to and including March 5, 1936, the date of the last importation here involved, ten reciprocal trade agreements had been negotiated with foreign countries. A tabulated list of these is given in the decision of the trial court as follows:

| Date | Country | T. D. No. |
|---|---|---|
| Aug. 24, 1934 | Cuba | 47232 |
| Feb. 2, 1935 | Brazil | 48034 |
| Feb. 27, 1935 | Belgium & Luxemburg | 47600 |
| Mar. 28, 1935 | Haiti | 47667 |
| May 25, 1935 | Sweden | 47785 |
| Sept. 13, 1935 | Colombia | 48258 |
| Nov. 15, 1935 | Canada | 48033 |
| Dec. 18, 1935 | Honduras | 48131 |
| Dec. 20, 1935 | Netherlands | 48075 |
| Jan. 9, 1936 | Switzerland | 48093 |

49 Stat. 3559, 3808, 3680, 3737, 3755, 3875, 3960, 3851, 50 Stat. 1504, 49 Stat. 3917.

In addition to · the foregoing trade agreements entered into under authority of the Act of June 12, 1934, a certain agreement was reached between the United States and Russia in ˙July, ˌ1935, the same being evidenced ·by identical notes exchanged between the United States Ambassador to Russia and the People's Commissar for Foreign Affairs at Moscow on July 13, 1935. The note of the United States Ambassador, which is identical in language with. that of the People's Commissar, reads:

"Embassy of the United States
of America
"Moscow, July 13, 1935.
"Excellency:

"I have the honor to refer to recent conversations in regard to commerce be-' tween the United States of America and the Union of Soviet Socialist Republics and to the trade agreements program of the United States of America, and to confirm and to make of record by this note the following agreement which has been reached between the Governments of our respective countries:

"1. The duties proclaimed by the President of the United States of America pursuant to trade agreements entered into with foreign governments or instrumentalities thereof under the authority of the Act entitled, 'An Act to Amend the Tariff Act of 1930', approved June 12, 1934, shall be applied to articles the growth, produce, or manufacture of the Union of Soviet Socialist Republics as long as this Agreement remains in force. It is understood that nothing in this Agreement shall be construed to require the application to articles the growth, produce, or manufacture of the Union of Soviet Socialist Republics of duties or exemptions from duties proclaimed pursuant to any trade agreement between the United States of America and the Republic of Cuba, which has been or may hereafter be concluded.

"2. On its part, the Government of the Union of Soviet Socialist Republics will take steps to increase substantially the amount of purchases in the United States of America for export to the Union of Soviet Socialist Republics of articles the growth, produce, or manufacture of the United States of America.

"3. This agreement shall come into force on the date of signature thereof. It shall continue in effect for 12 months. Both parties agree that not less than 30 days prior to the expiration of the aforesaid period of 12 months, they shall start negotiations regarding the extension of the period during which the present Agreement shall continue in force.

"Accept, Excellency, the renewed assurances of my highest consideration.
"William C. Bullitt.
"His Excellency
"Maxim M. Litvinov,
"People's Commissar for Foreign
"Affairs, Moscow."

On the date of the foregoing correspondence, the United States Department of State issued a statement for the press, which has been made a part of the record in the case, as Exhibit 2, parts of which read:

"Department of State
"July 13, 1935.
"For the Press:

"An agreement to facilitate and increase trade between the United States and the Union of Soviet Socialist Republics was concluded at Moscow today in an exchange of notes between Ambassador William C. Bullitt and the Commissar for Foreign Affairs, Mr. Maxim Litvinoff.

"These notes provide a sound basis for a mutually beneficial expansion of trade between the United States and the Soviet Union. This agreement with the Soviet Union, although intimately related to the trade agreements program of the United States, was not concluded pursuant to the authority of the Trade Agreements Act of June 12, 1934. It does not involve any reciprocal concessions in respect of tariff rates. In return for the undertaking on the part of the Soviet Government, which controls the import and export trade of the Soviet Union, to increase substantially its purchases of American products during the next twelve months, the Government of the United States has agreed to extend to the Soviet Union, as long as the agreement remains in force, the benefits of tariff concessions granted under reciprocal trade agreements with other countries. * * *"

It may be added that the agreement with Russia has not been published in the Treasury Decisions nor proclaimed by the President.

It also appears from the several Treasury Decisions above cited that each of the President's proclamations was accompanied by a letter addressed by the President to the Secretary of the Treasury of the United States. The letter which accompanied the proclamation of the agreement with the Netherlands is fairly typical of all those letters. Pertinent portions of it read:

"My dear Mr. Secretary:

"The Act to amend the Tariff Act of 1930, approved June 12, 1934, provides in part that the President may suspend the application of duties proclaimed under its authority to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in the Act. Pursuant to this provision of the Act, I hereby direct that the duties proclaimed on this date in connection with the trade agreement signed on December 20, 1935, with the Kingdom of the Netherlands shall be applied only to articles the growth, produce, or manufacture of the countries hereinafter designated and to such articles, in the case of each country, respectively, for the period indicated in the numbered section below in which such country is designated.

"1. In respect of the products of each country designated in this section, the proclaimed duties shall be applied from the effective date of such duties until thirty days from the date on which you are notified by me that the United States has ceased, or on a day certain will cease, to be bound by provisions of a treaty or agreement providing for most-favored-nation treatment in respect of customs duties.

Denmark    Portugal and its colonies
                       and possessions
Italy

"2. In respect of the products of each country designated in this section, the proclaimed duties shall be applied so long as such duties remain in effect and this direction is not modified in respect of such country.

*        *        *        *

"Union of Soviet Socialist Republics
*        *        *        *

"Because I find as a fact that the treatment of American commerce by Germany is discriminatory, I direct that the proclaimed duties shall not be applied to products of Germany.

"In respect of the products of France (including Algeria) and its assimilated colonies, namely, Indo-China, Madagascar, Reunion, Guadeloupe, Martinique, and Guiana, instructions as to the application of the proclaimed duties will be issued at a later date.

"You will please cause this direction to be published in an early issue of the Weekly Treasury Decisions.

"Sincerely yours,
"Franklin D. Roosevelt."

The dates above set forth in the tabulated list are the dates on which the respective agreements were concluded and signed. Each agreement specified a time

when it should become effective following its proclamation by the President, and it appears that in several instances, although the date of the *agreement* antedated that of either of the involved importations, the dates of the *proclamations* and the dates when they became effective were subsequent to such importations. The agreement with the Netherlands upon which appellant strongly relies became effective as of February 1, 1936, the proclamation of the President having been issued December 28, 1935. It is thus to be seen that at the time of the first importation involved, January 8, 1936, that agreement was not in effect. However, other of the agreements were in effect on that date and it is appellant's theory that the January 8th importation is entitled to free entry because of that fact for reasons hereinafter stated.

It insists moreover that even if that importation be not entitled to free entry, the importation of March 5, 1936, is so entitled, it having been made after the effective date' of the agreement with the Netherlands.

The brief on behalf of appellant summarizes its contentions under five headings, as follows:

"First: That under the terms of the Act of June 12, 1934, every benefit or privilege granted to any country (Cuba excepted) under the terms of any trade agreement, becomes immediately and automatically applicable for the benefit of merchandise imported from every other non-discriminating country;

"Second: That the exemption from the tax imposed by Section 601 of the Revenue Act of 1932, which has been extended to various countries by virtue of the most-favored-nation clause written into the trade agreements with those countries, is a benefit or privilege of a character that is included within the terms of the Act of June 12, 1934;

"Third: That the proclamations of the President promulgating the various trade agreements, have extended to the Union of Soviet Socialist Republics the unconditional most-favored-nation treatment which forms a part of each trade agreement so proclaimed;

"Fourth: That the terms of the agreement with the Soviet Government require the extension of the same exemption from tax to coal imported from Russia, as is extended to coal imported from other countries by virtue of other trade agreements;

"Fifth: That even if none of the foregoing contentions is sustained, the exemption from tax must be extended to all coal imported from Russia after the effective date of the trade agreement with the Netherlands."

The contentions on behalf of the Government are summarized in its brief as follows:

"1. Under the terms of the agreement with the Soviet Union, it is specifically provided that 'the duties proclaimed by the President of the United States of America pursuant to trade agreements entered into with foreign governments or instrumentalities thereof under the authority of the act entitled, "An Act to Amend the Tariff Act of 1930", approved June 12, 1934, shall be applied to articles * * * of the Union of Soviet Socialist Republics'. This leads to the inevitable conclusion that coal imported from the Soviet Union is taxable under the provisions of the Revenue Act, unless duties on coal have been proclaimed by the President pursuant to a trade agreement entered into under the Trade Agreement Act.

"2. At the time of importation, the President of the United States had not proclaimed any duties on coal under any trade agreement with any foreign country. The decision of the lower court rests basically upon these two conclusions.

"3. In the absence of a proclaimed rate, there is no merit whatsoever in the appellant's claim.

"4. The Trade Agreement with the Netherlands is utterly irrelevant to all of the issues in the case at bar, because no duties were proclaimed on coal.

"5. The terms of the executive agreement between the United States and the Soviet Union, so far as coal is concerned, has been completely complied with by the United States."

By permission of the court, a brief was filed by attorneys for Anthracite Institute et al. as amici curiæ. This brief generally is in support of the Government's' position, but also presents suggestions upon certain matters which, in view of our conclusion, we do not find it necessary to discuss.

Each of the trade agreements proclaimed by the President has as a part thereof a schedule of articles arranged in the or-

der of the paragraphs of the Tariff Act of 1930. In the first column of the schedule the number of the paragraph is given; in the second column the article is named, and in the third the duty rate to be applied is stated. In the case of the agreement with the Netherlands there appears a "note," typical of "notes" in other of the agreements, which reads:

"Note.—The provisions of this *schedule* shall be construed and given the same effect, and the application of collateral provisions of the customs laws of the United States to the provisions of this *schedule* shall be determined insofar as may be practicable as if each provision of this *schedule* appeared respectively in the statutory provision noted in the column at the left of the respective descriptions of articles.

"In the case of articles enumerated in this *schedule,* which are subject on the day of the signature of this agreement to additional or *separate ordinary customs duties,* whether or not imposed under the statutory provision noted in the column at the left of the respective description of the article, *such separate or additional duties shall continue in force,* subject to any reduction *indicated in this scedule or hereafter provided for,* until terminated in accordance with law, but shall not be increased." (Italics ours.)

In its decision the trial court said:

"We have carefully examined the text of each of these agreements and the schedules of duties annexed thereto, and fail to find in any of them or in the proclamations of the President anything which might be construed as a proclaimed 'modification of duties or other import restrictions' applicable to coal, coke, or briquettes imported from any of the countries with which such agreements were concluded."

Upon the fact so found, the trial court bases its decision.

In view of the contentions made before us it seems proper at this point to state the following:

At the time the importations here involved were made, it does not appear that any coal was being admitted into the United States from any foreign country without the payment of the tax provided by section 601 (a), *supra,* of the Internal Revenue Act of 1932, 26 U.S.C.A. § 1420 et seq. note, *by reason of any agreement entered into under the provisions of the Reciprocal Trade Agreements Act of June 12, 1934,* 19 U.S.C.A. §§ 1351–1354, *supra,* coal not having been included in any schedule of any agreement. Coal from Canada was entitled to admission without the payment of the tax because of the trade balance in that commodity favorable to the United States during the calendar year 1935, and coal was entitled to such admission from various other foreign countries (without reference to the trade balance) *by reason of most-favored-nation treaties existing between the United States and those countries.* United States v. Domestic Fuel Corp. et al., 71 F.2d 424, 21 C.C.P.A.Customs, 600, T.D. 47010.

Coal from countries with which the United States had no most-favored-nation treaty (in cases where the balance of trade in coal was adverse to the United States) was held by this court not to be entitled to admission without payment of the tax in the case of George E. Warren Corp. v. United States, 71 F.2d 434, 22 C.C.P.A., Customs, 178, T.D. 47125, certiorari denied by the U.S.Supreme Court, 293 U.S. 586, 55 S.Ct. 100, 79 L.Ed 681.

So far as appellant and the Government are here concerned, it is agreed that the tax imposed is in the nature of an import duty, section 601 (b), 26 U.S.C.A. § 1420 et seq. note, supra, providing that it shall be "levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act * * *." See also Faber, Coe & Gregg, Inc., v. United States, 19 C.C.P.A., Customs, 8, T.D. 44851, certiorari denied by the U.S.Supreme Court, 284 U.S. 634, 52 S.Ct. 18, 76 L.Ed 539.

As has been indicated, appellant's first contention is that the coal at issue is entitled to entry without the payment of the tax because of the provision in the Act of June 12, 1934, 19 U.S.C.A. § 1351, declaring:

"The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of *all* foreign countries, whether imported directly, or indirectly." (Italics ours.)

In arguing this point, the brief on behalf of appellant, after stating that the only exception to the rule is with respect to a country concerning which the Presi-

dent shall have found discriminatory treatment, says:

"The unlimited scope of this language has been recognized by both the United States Customs Court and this Court. See Abstract No. 34957 published on November 2, 1936, protest of John A. Vandiver, being a decision of the United States Customs Court; and F. H. Von Damm v. United States, 90 F.2d 263, 25 C.C.P.A. ——, T.D. 49094, being a decision of this court handed down May 29, 1937, in which it is said on page 269 that 'The Haitian agreement was made under section 350 (a), supra, and this rate was therefore automatically extended to all non-discriminating countries.'"

■ This broad contention of appellant is, we think, untenable. It is clear that, by the quoted provision of the statute, the duties and import restrictions agreed upon and proclaimed by the President *become applicable to the articles named in the schedule,* not only when they are imported from the country with which the proclaimed agreement exists, but when imported, directly or indirectly, from any other country not discriminating against the United States, but we are of the opinion that in both instances only the articles and duties specified in the proclamation are affected. It is noted that in Article III of the agreement with the Netherlands, taken as typical, it is said:

"Articles the growth, produce or manufacture of the Kingdom of the Netherlands *enumerated and described in Schedule II annexed to this Agreement,* shall, on their importation into the United States of America, be exempt from ordinary customs duties in excess of those set forth in the said Schedule. * * *" (Italics ours.)

Under its second heading, quoted supra, the brief for appellant argues, in effect, that to limit the application of the proclamation to merchandise stated in the schedules disregards or ignores the language of subsection (c) of the Act of June 12, 1934, supra, 19 U.S.C.A. § 1351 (c), which includes as falling within the purview of the Act "limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports."

We do not think that any such result follows. Assuming, without holding, that the tax on coal provided in the Revenue Act of 1932 is by the provisions of the Trade Agreements Act of June 12, 1394, supra, placed within the purview of negotiation in arriving at trade agreements, it would seem that where dealt with it should be, under the terms of the Trade Agreements Act itself, specified in a schedule, and in so holding the courts are not disregarding any of the provisions of subparagraph (c).

It is proper to say that the last above stated argument is made by appellant in connection with its contention respecting the effect of most-favored-nation clauses in the several agreements—a question later to be discussed.

Surely, it may not be contended with any plausibility whatsoever that articles *not* provided for in the agreement become subject to duty rates or tax provisions other than those provided by the statutes, such as the Tariff Act of 1930 and the Internal Revenue Act of 1932. In other words, articles not provided in the agreement remain subject to the customs and tax laws provided by statutes other than the Act of June 12, 1934, supra, or subsequent agreements made under the last named act. See note to the Netherlands agreement, supra.

■ Coal not being named in any schedule of any trade agreement in effect at the time of the importation here involved, it seems obvious that coal from Russia is not entitled to entry tax free merely by reason of the quoted provision from the Act of June 12, 1934. The authorities cited in the quotation from appellant's brief, supra, do not seem to us to have any bearing upon this point.

It is, however, pointed out by appellant that coal and coke are specifically mentioned in the agreement with the Netherlands, although they are not named in the schedule itself. The reference to these materials so alluded to is found in Article I of that agreement and is in connection with references to most-favored-nation treatment. The pertinent portions of Article I read:

"The United States of America and the Kingdom of the Netherlands will grant each other unconditional and unrestricted most-favored-nation treatment in all matters concerning customs duties and charges of every kind and in the method of levying duties, and, further, in all matters concerning the rules, formalities and charges imposed in connection with the clearing of

goods through the customs, and with respect to all laws or regulations affecting the sale or use of imported goods within the country.

\*　　\*　　\*　　\*

"It is understood that so long as and insofar as existing law of the United States of America may otherwise require, the provisions of this Article, insofar as they would otherwise relate to duties, taxes or charges on coal, coke manufactured therefrom, or coal or coke briquettes, *shall not apply to such products imported into the United States of America.* If the law of the United States of America shall not permit the complete operation of the provisions of this Article with respect to the above-mentioned products, the Kingdom of the Netherlands reserves the right to impose on such products originating in the United States of America, after September 1, 1936, duties or charges other or higher than those imposed on like products originating in third countries, or within fifteen days after the aforesaid date, to terminate this Agreement in its entirety on thirty days' written notice." (Italics ours.)

A full construction of the last paragraph just quoted does not appear to be necessary here and none is attempted, but it would seem fairly inferable that there may have been, on the part of those representing the United States in the negotiation of the agreement, a doubt as to just what might be done with reference to the tax upon imported coal provided by the Internal Revenue Act of 1932, as extended by the different acts cited, *supra.* The Article did not purport to affect the duty, or tax, upon coal, but left it subject to the laws of the United States, with certain rights reserved to the Netherlands in the event it was determined that, by reason of such United States laws, the tax should be levied upon importations from the Netherlands.

It is disclosed by the record that the General Counsel of the United States Treasury Department in a letter of September 5, 1936, addressed to counsel for appellant, advised that coal which should be imported *during 1937* would be admitted without the payment of the tax, and this information seems to have been communicated by the Secretary of State to the Royal Netherland Legation in the city of Washington.

The General Counsel's letter reads:
"General Counsel,
"Treasury Department,
"Washington.
"34–421.
"Sept. 5, 1936.
"Curtis & Belknap,
"61 Broadway,
"New York, N. Y.
"Gentlemen:
"Reference is made to your letter of July 6, 1936, requesting a ruling on the question of whether or not coal, coke and briquettes imported from the Netherlands during the calendar year 1937 would be admitted free of the tax prescribed by section 601 (c) (5) of the Revenue Act of 1932 (47 Stat. 259) and your letter of July 27, 1936, enclosing a brief covering your views in the matter.

"After consideration of the problem, the Department has decided, in view of Article I of the Netherlands Trade Agreement (1935), T.D. 48075, that coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom, and coal or coke briquettes imported from the Netherlands during the calendar year 1937, whether or not the United States has enjoyed a favorable balance of trade in such articles with the Netherlands during the present calendar year, will be entitled to enter without payment of the excise tax prescribed by section 601 (c) (5) of the Revenue Act of 1932 (47 Stat. 259) so long as all existing factors remain unchanged.
"Very truly yours,
"Herman Oliphant,
"General Counsel."

The ruling so announced, it will be observed, was restricted to importations during the calendar year 1937. It did not purport to affect importations from the Kingdom of the Netherlands itself during the year 1936, although issued in September of that year. It is not seen how it could affect the taxable status of coal importations from Russia in January and March, 1936.

We next turn to the agreement evidenced by the correspondence between the United States Ambassador and the People's Commissar for Foreign Affairs of Russia, quoted *supra.* The interpretation placed upon this agreement by the Department of State, coincident with the date of the correspondence (July 13, 1935,) in the

paper issued for the press, is that it was "An agreement to facilitate and increase trade between the United States and the Union of Soviet Socialist Republics." It is stated that the agreement, "although intimately related to the trade agreements program of the United States, *was not concluded pursuant to the authority of the Trade Agreements Act of June 12, 1934.*" (Italics ours.)

The agreement concededly is not a treaty as that term is used in the Constitution of the United States. It does not purport to be other than a trade agreement, and, even as that, as has been stated, it has never been proclaimed nor published in the Treasury Decisions.

It carries no rate provisions nor does it refer specifically to any particular article or articles, nor is there any reference in the notes which were exchanged to most-favored-nation treatment.

The identical notes do recite that "The *duties proclaimed* by the President of the United States of America pursuant to trade agreements entered into with foreign governments or instrumentalities thereof under the authority of the Act entitled, 'An Act to Amend the Tariff Act of 1930,' approved June 12, 1934, shall be applied to articles the growth, produce, or manufacture of the Union of Soviet Socialist Republics as long as this Agreement remains in force." (Italics ours.)

It will be observed that the foregoing goes no further with respect to the admission of the products of Russia than is provided with respect to the products of all non-discriminating countries by section 350 (a) of the Act of June 12, 1934, supra. Indeed, in the identical notes the words "and other import restrictions," included in section 350 (a), do not appear.

There is nothing in the record which sheds any particular light upon the reasons for the agreement so made between the United States and Russia, aside from the press notice issued by our Department of State.

Whatever may have been the reason, the agreement was limited specifically to the duties proclaimed under authority of the Act of June 12, 1934, and, since no such duties had then been, nor have since been proclaimed relative to coal imported from *any* country, we are unable to discern how any right accrued by the agreement to import coal from Russia tax-free in 1936.

Much emphasis is placed by appellant upon the point stated in its third heading, supra, to the effect that the proclamations by the President have extended the unconditional most-favored-nation treatment, forming a part of each trade agreement, to Russia. To be strictly accurate, it should be said that such extensions do not appear in the body of the proclamations, but are stated in the accompanying letters addressed to the Secretary of the Treasury, as is said in the decision of the trial court. The pertinent portions of the letter accompanying the proclamation of the agreement with the Netherlands have been quoted, supra. For clarity, however, we here requote certain parts. After reciting the Act, it is stated by the President:

"* * * I hereby direct that the *duties proclaimed* on this date * * * shall be applied only to articles the growth, produce, or manufacture of the countries hereinafter designated * * * in the numbered section below * * *. [Italics ours.]

*  *  *  *

"Union of Soviet Socialist Republics
*  *  *  *"

In their brief, counsel for appellant, taking the proclamation of the agreement with Sweden as typical, turn to its text as distinguished from its schedule, and quote therefrom in extenso.

The matter quoted is summarized in the brief as follows:

"We invite specific attention to the fact that the preamble quoted above refers to both duties and 'other import restrictions' of the United States', and that Article 9 as quoted above refers both to "the tariff advantages and other benefits" which are granted by the United States to Sweden; and that the final action taken by the President is to *proclaim the said agreement, including the schedules,* to the end that the whole and every part thereof may be observed and fulfilled.

"The principal parts other than the schedules are those parts of Article I which contain the provision for unconditional and unrestricted most-favored-nation treatment in all matters concerning customs duties and subsidiary charges of every kind. We submit that under the terms of that proclamation coal from Sweden would clearly be entitled to entry free of tax so long as coal from Canada or any other country was so entitled. We submit that the learned Court below fell in-

to error when it held, (Record, pp. 63 and 64) that the benefits accruing by virtue of the most-favored-nation clause are independent of and have no relation to tariff advantages or disadvantages embodied in proclaimed modifications of duties and other import restrictions to which Section 350 (a) (2) applies."

It seems to us that in the foregoing argument appellant seeks to have embraced within the purview of the Trade Agreements Act of June 12, 1934, supra, the most-favored-nation treatment, although that is not therein mentioned.

Assuming that in every instance full authority existed for including within the agreements and proclamations thereof, the most-favored-nation clause, the fact remains that nothing is found in any agreement or proclamation, or in any letter accompanying any proclamation, any expression which, in our opinion, would justify a holding that the most-favored-nation treatment has been extended to Russia. By the terms of the Act of June 12, 1934, supra (even without reference to the agreement with Russia of July 13, 1935), products from Russia, in the absence of discrimination, would appear to be admissible at the same rates of duty as the products of those countries with which trade agreements have been made and proclaimed, and the President, evidently finding no discrimination on the part of Russia, has so declared in the exercise of his authority under the law, but we are unable to find where the authority has been exercised in a manner leading to the result for which appellant contends. It is not found where the Executive has done anything more than extend to the products of Russia the rates of duty or tax proclaimed in schedules embodied in the trade agreements with other countries—a matter provided by the statute under which the proclamation and letters were issued.

So far as the contention respecting the application of the provision in section 601 (a), 26 U.S.C.A. § 1420 et seq. note, that the tax shall be imposed "unless treaty provisions of the United States otherwise provide," we do not feel that coal from Russia comes within the limitation. It is not insisted that the notes which were exchanged constituted a treaty in the usual sense of that term, but it is argued on behalf of appellant that they constitute a treaty under the doctrine announced by the Supreme Court in the case of B. Altman & Co. v. United States, 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894. We do not deem it necessary here to determine this question since, in our view, the notes do not embrace the subject matter here involved.

Our views, and the reasons therefor, with respect to the fifth contention of appellant, to the effect that, in any event, the coal entered on March 5, 1936, is entitled to admission without payment of the tax, have been sufficiently indicated to require no further discussion.

We find no error in the decision of the United States Customs Court and the judgment appealed from is affirmed.

Affirmed.