MORGANITE, INC. *v.* UNITED STATES (No. 4805)[1]

United States Court of Customs and Patent Appeals, June 28, 1955

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for appellant.
*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *William J. Vitale*, special attorneys, of counsel), for the United States.

[Oral argument December 7, 1954, by Mr. Rode and Mr. FitzGibbon]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:
We have here an appeal from the judgment rendered by the major-

---

[1] C. A. D. 595.

ity of the Third Division of the United States Customs Court (C. D. 1573, 32 Cust. Ct. 6), in the above styled case.

The rate of duty was determined upon the basis of the classification of the merchandise, and, as to this classification, one judge of the Customs Court dissented.

Both the majority and the minority of that court agreed that the merchandise, which was described on the consular invoice as "Carbon Powder," was provided for in paragraph 216 of the Tariff Act of 1930 as finally modified by the General Agreement on Tariffs and Trade proclaimed by the President of the United States in T. D. 51802, on the sixteenth day of December, 1947 (82 Treas. Dec. 305), but they disagreed as to the specific phraseology of the paragraph, as modified, which is applicable to the merchandise.

The majority held that the merchandise falls within the provisions in T. D. 51802 for "Articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for * * *" and so correctly assessed with duty at 15 per centum ad valorem.

The appellant contends and the dissenting judge held that the merchandise falls within the provision for "plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes * * *" at 12½ per centum ad valorem.

Appellant makes no criticism of the majority's description of the intrinsic character, or nature, of the merchandise which was derived from the testimony of appellant's witness. We quote the following from the majority opinion:

In support of this [appellant's] claim there was introduced the testimony of one witness, the technical manager of the importer, who testified substantially as follows: It is his duty to supervise the processing of this carbon powder, after importation, in plaintiff's plant. He described the material in its condition, as imported, as follows:

It is a combination of various carbons, graphites, with various types of binders consisting primarily of tars, pitches, which in the processing will form the hard, compact block from which brushes are cut.

The invoice covers three types of powder which are similar but differ in composition. The witness described the processing of the imported carbon powder after importation and produced samples of articles in the form of hard, compact blocks, obtained as a rusult of such processing. He stated that said blocks are used for the ultimate manufacture of carbon brushes, which brushes are used as electrical contacts on rotating equipment.

There was also testimony tending to show that the imported merchandise would probably not be useful for any other purpose than manufacture into electrical brushes.

It is not uncommon for provisions to be put in paragraphs of tariff acts for many different articles and provide classifications based upon

their intrinsic character which leads to duty assessments on them at different rates. That was true in the case of paragraph 216 of the Tariff Act of 1930 as originally enacted. In full it reads:

Par. 216. Carbons and electrodes, of whatever material composed, and wholly or partly manufactured, for producing electric arc light, if less than one-half inch in diameter or of equivalent cross-sectional area, 60 per centum ad valorem; if one-half inch or more in diameter or of equivalent cross-sectional area, 45 per centum ad valorem; electrodes, composed wholly or in part of carbon or graphite, and wholly or partly manufactured, for electric furnace or electrolytic purposes; brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes; and articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for, 45 per centum ad valorem.

So far as the issue here is concerned, however, there was a subsequent modification of the classification as evidenced by the modification of the duty rates imposed.

As arranged in T. D. 51802, the General Agreement on Tariffs and Trade, the terminology is as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| * * * | * * * | * * * |
| 216 | Carbons and electrodes, of whatever material composed, and wholly or partly manufactured, for producing electric arc light: | |
| | If less than one-half inch in diameter or of equivalent cross-sectional area. | 20% ad val. |
| | If one-half inch or more in diameter or of equivalent cross-sectional area. | 15% ad val. |
| 216 | Electrodes, composed wholly or in part of carbon or graphite, and wholly or partly manufactured, for electric furnace or electrolytic purposes. | 15% ad val. |
| 216 | Brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes. | 12½% ad val. |
| 216 | Articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for. | 15% ad val. |

With reference to the wording of the statute and of the trade agreement as quoted above, it will be observed that, with the excep-

tion of rates, the phraseology used in the trade agreement in the last two paragraphs quoted immediately above is precisely the same as that used in paragraph 216 as originally passed, but in the trade agreement the rate of duty on the merchandise which falls within the phraseology, "Brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes," is fixed at 12½% ad valorem, while that which falls within the phraseology, "Articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for," is fixed at 15% ad valorem.

It seems to us clear (and we do not understand appellant to contend otherwise) that the phraseology "plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes," admits of a *classification* different from that covered by the phrase "Articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for." In the original act, however, Congress saw fit to make the *duty rates* upon both classes of material the same, and this similarity of *rates*, like the identity of the other phraseology, continued, so far as the record shows, until the promulgation of T. D. 49753, dated November 17, 1938, setting out the Trade Agreement with the United Kingdom.

It should be borne in mind that the original act authorizing the President of the United States to enter into reciprocal trade agreements with foreign nations enacted in 1934 (48 Stat. 943) limited his authority to increase or decrease the rates fixed by Congress itself in the Act of 1930 to not more than 50 per centum, but subsequently in an act passed in 1945 (59 Stat. 410, enacted July 5, 1945) the 1934 act was amended so that the President was empowered to reduce or increase *existing* rates 50 per centum, however those rates had been established. Under the 1934 act (as extended), a trade agreement (T. D. 49753) was negotiated with the United Kingdom wherein the duty rate for the first group defined, *supra*, was reduced to 25%, slightly more than half of the rate of 45% fixed in the Tariff Act of 1930, and that of the second group at 30% which was slightly more than half of the rate of 45% fixed in that act.

The General Agreement on Tariffs and Trade, which governs the present importation, was made under the authority of the 1934 act as amended by the 1945 act, and in that agreement the rates on the two groups here involved were reduced to the maximum extent allowed, i. e., 12½% ad val. and 15% ad val. respectively.

There is no contention here that the President did not have the power to assess merchandise of the type here involved with either rate of duty. The sole question, as phrased in substance by the majority of the lower court, is the intent of the negotiators to the General Agreement.

The question of interpretation which is presented is what meaning should be attached to the phrase *"and other forms"* in the wording "plates, rods, and other forms * * * for manufacturing into * * * brushes." If the phrase "other forms" includes the mixture of powders and binders here involved, then the decision of the lower court must be reversed, and the importer's protest sustained. If the phrase "other forms" does. not include such mixture dedicated, as here, to the manufacture of electrical brushes, then the decision of the majority of the lower court was correct.

The first contention of importer, and the holding of the dissenting judge below, is that the phrase "other forms" is unambiguous; that it includes within such unambiguous meaning the *powder* "form"; and that, consequently, no recourse may be made to "extraneous" sources for interpretation of the phrase. We cannot agree that the phrase "and other forms" as used here is unambiguous. In support of its contention that the phrase is unambiguous appellant quotes as follows from various lexicographic sources:

*Webster's New International Dictionary* 1930 edition defines the words "Powder" and "Form" as:

"Powder n. * * *
2. A preparation in the form of fine particles."

"Form n. * * *
2. The shape and structure of anything; as distinguished from the material of which it is composed; particular or distinctive disposition, or arrangement of matter, giving it individuality or distinctive character; configuration; figure.

    *     *     *     *     *     *     *

4. One of the different modes of existence, action, or manifestation of the same thing or substance; a kind; a modification; a species; a variety, as, the diamond, graphite, and soot are allotropic *forms* of carbon."

*Funk & Wagnall's New Standard Dictionary* 1939 Edition defines "form" as:

1. The outward or visible shape of a body as distinguished from its substance or color; the peculiar configuration by which an object is recognized by the sight or touch; figure, especially of a person.

    *     *     *     *     *     *     *

3. The appearance or character in which a thing presents itself * * *.

It is noted that Webster's dictionary lists 30 different definitions of the noun "form" and Funk and Wagnall's lists 24. The appropriate definition, and the particular sense in which it is used, must of course be derived from the context. As used here, the word "form" is subject to the interpretation placed upon it by appellant, i. e., that it

means form in a broad, abstract sense. In that sense, the phrase would be read as if it were "other forms *of material*." Powder would be classed as a "form" of material in this broad sense. However, such interpretation is not the only one possible, and a narrower meaning for "forms" might have been intended. It may be that "forms" means articles which have acquired a definite form or shape as distinguished from material which is formless. We speak of dress *forms*, and visualize an object with a definite shape. In that sense, powder would not be a "form," but would be formless, while plates, rods, or blocks formed from the powder would be "forms" for making brushes. Thus, the phrase would be read as if it were "plates, rods, and other *shapes*, for manufacturing into brushes." From the context, we are unable to determine whether the word "forms" is intended to refer broadly to any and all forms of material, as contended by appellant, or whether it refers only to such articles as have acquired a definite and fixed shape, or "form." It is therefore necessary, in our opinion, in view of the ambiguity, to consult such auxiliary references as may be pertinent to determine which sense was intended.

We are here confronted with a situation where it is possible that the phrase referred to was used in one sense at one time, and in another sense at a later time. Specifically, it may be that at the time of its original use in the tariff act as enacted, Congress used the phrase in one sense, while the President in entering into the trade agreements previously referred to used the phrase in a different sense. We proceed to an investigation of the various interpretative aids to determine whether the phrase "and other forms" was actually used in different senses by Congress and the President.

The language in dispute here had its origin in the Tariff Act of 1922. A clear indication of the meaning attached to the phrase in that act is contained in the *Summary of Tariff Information, 1921*. At page 305 of the *Summary* there is a discussion of the involved paragraph, and the following comment appears:

*Important changes in classification.*—The provision for electrodes has been broadened to include those in part of carbon as well as those in chief value of carbon. All electric brushes of whatever material composed have been included in this paragraph, as well as all wholly or partly manufactured *material* for manufacture into brushes. This is of importance, as *material* for brushes has been imported as manufactures of metal. [Emphasis added.]

We are of the opinion from the above quoted excerpt from the *Summary* and from a review of the other legislative history which is of like effect, that Congress in using the phrase "and other forms" in the Tariff Act of 1922 meant that phrase broadly to include other forms of *material* dedicated to the manufacture of electrical brushes. The powder form is certainly such a form as was contemplated by Congress in the 1922 Act, and if this meaning governs, the importer's

protest must be sustained. We must therefore inquire as to whether that meaning has been superseded.

The Tariff Act of 1930 reenacted paragraph 216 of the 1922 Act without change, and we have found no indications of any congressional intent to give that paragraph any different interpretation than it had in the 1922 Act.

The question remains, was the meaning changed in either the Trade Agreement with the United Kingdom, or the General Agreement on Tariffs and Trade, both of which, insofar as here pertinent, used the exact wording of the tariff act. In a 170 page publication of the State Department with the series title *Press Releases*, and the specific title, "The Trade Agreement with the United Kingdom signed November 17, 1938," (Vol. XIX: No. 477, Supplement A, Publication 1252), there is a comprehensive treatment of the concessions granted in the agreement, prepared by the representatives of the Departments of State, Agriculture, Commerce, and Treasury, and the Tariff Commission. In this document, presumably authoritative, there is no information which would shed any light upon the intent of the negotiators with regard to products of the type here involved.

On the other hand, in a publication of the Tariff Commission entitled, "Trade Agreement Between the United States and the United Kingdom—Digests of Trade Data with respect to Products On which Concessions Were Granted by the United States," 1938, there is a discussion of "Brushes for Electric Motors, and Plates for Such Brushes," and of "Manufactures of Carbon or Graphite, Not Specially Provided For." (Vol. III, Schedule 2, pp. 2–61 to 2–64.) This publication, it must be noted, was published *after* the Trade Agreement with the United Kingdom, although it was apparently summarized from data available to the negotiators. However, there is no evidence that the data was before the negotiators *in the form* it appears in the so-called digests. In the digests, there is nothing under the discussion of brushes, etc., which would indicate that material of the type here involved was either included or excluded. Under the discussion of manufacturers of carbon or graphite, n. s. p. f., however, appear the following statements:

*United States imports*
    *        *         *        *        *        *        *

Imports from the United Kingdom, the chief supplier, consists mainly of carbon powder, and a mixture of carbon and copper powder, products used for making brushes. * * *
    *        *         *        *        *        *        *

*Competitive conditions*
In the case of the most valuable item imported under this provision of paragraph 216 (believed to be the carbon and copper powder mentioned above), imports constitute a raw material for a domestic brush manufacturing industry, as does also a certain portion of imports of carbon plates. * * *

From this information we may conclude that the Tariff Commission, at the time of the publication of the digests at least, interpreted the phrase "and other forms" as excluding material of the type here imported. We are unable to state definitely whether that was the Tariff Commission's interpretation at the time of the negotiations, or if it was, whether it was clearly before the negotiators. Even if it were so before the negotiators, it would not be conclusive evidence that the negotiators intended to adopt that interpretation. The material offered by the Tariff Commission may have influenced the negotiators in determining what concessions they would grant, but their *intent* may have been to grant such concessions to whatever merchandise was covered in the act as enacted.

The second trade agreement, and the one which is now effective, is the General Agreement on Tariffs and Trade. We have endeavored to ascertain the negotiator's specific intent in the concessions they granted in the General Agreement, but have been unable to discover any evidence more satisfactory than that discussed with reference to the United Kingdom agreement.

In the "Analysis of General Agreement on Tariffs and Trade," Department of State Publication 2983, Commercial Policy Series 109, Released November, 1947, which contains notes on many of the concessions granted, we have been unable to find any discussion whatever of paragraph 216. However, in the *Summaries of Tariff Information 1948*, Vol. II, part 1, there is a treatment of articles encompassed in paragraph 216. Under the heading "Carbon and Graphite Brushes for Electrical Appliances; and Plates, Rods, and other forms for Manufacturing into Brushes" appears the following:

* * * Imports of carbon and graphite plates, rods, etc., into the United States for making brushes were small until the trade agreement with the United Kingdom in 1939. * * *

\*       \*       \*       \*       \*       \*       \*

The rate of duty of 25 percent ad valorem on imports of carbon or graphite brushes and *brush stock* was reduced to 12½ percent in the Geneva Agreement. [Emphasis added.]

In the same publication under the heading "Articles and Wares, wholly or in part of Carbon or Graphite, N. S. P. F.," it is stated:

This summary covers (1) a large group of carbon and graphite articles and wares n. s. p. f. and (2) bulk calcined petroleum coke. The first group is composed for the most part of small articles having relatively high unit values; among the more important are filter blocks, carbon light filaments, graphite molds, graphite packing and gaskets, *carbon powder for making electrical brushes*, and telephone, radio, and hearing-aid specialty parts of carbon. They are used principally in the electrical industry. Bulk petroleum coke is a byproduct of the petroleum industry. The coke is calcined and is therefore unsuitable for use as a fuel. Most of the calcined petroleum coke is used in the manufacture of lighting carbons and carbon electrodes.[1]   [Emphasis added.]

The footnote to above paragraph as printed in the summary reads as follows:

¹ This summary does not include lighting carbons and carbon electrodes; *carbon or graphite brushes and brush stock;* carbon or graphite crucibles, retorts, and other refractory products (see separate summaries, par. 216); and synthetic rubber articles (see summaries on rubber manufactures, par. 1537 (b)). [Emphasis added.]

Exactly what is meant by "brush stock" is not further indicated in the summaries.

We note that the above-referred to *Summaries of Tariff Information 1948* were published *after* the General Agreement and there is no positive indication that such material was actually before the negotiators in the form it appears in the *Summaries*. Any presumption that it was before the negotiators is subject to serious doubt when we inspect Vol. II of the *Tariff Agreement Digests*, dated November, 1946, which bears the notation, "Prepared by the Tariff Commission for use in connection with trade agreement negotiations." That publication, though it contains much of the material included in the *Summaries*, does *not* include, either explicitly or inferentially, the above quoted statements from the *Summaries* which were heavily relied upon by the majority of the Customs Court in their decision in this case. The *Tariff Agreement Digests* leave indeterminate the classification of merchandise of the type involved here.

The issue in this case may be framed in view of the preceding discussion. We have decided that the prase "other form" for making brushes, as used in the tariff act is broad enough to cover the merchandise involved here. We must determine whether the involved trade agreements, although using the identical phraseology of the tariff act, have so narrowed the meaning of that phrase as to exclude the imported merchandise. If we should find such narrowing of the phrase, it must be based upon an interpretation by the Tariff Commission as to the meaning of the phrase, which in each case was published after the trade agreements, and may or may not have been before the negotiators.

We are of the opinion that in this case at least the use of the language of the statute in the trade agreement indicates an intent to apply the trade agreement concessions to the products covered by that language in the tariff act, whatsoever they may be. Even if a misinterpretation by the Tariff Commission were before the negotiators, it does not follow as a matter of course that the negotiators adopted that interpretation. They may have intended to apply the concession to *all* items covered by the language of the tariff act, whether the interpretation of the Tariff Commission were correct or not. Such an intent is more logical than the other, for if misinterpretations by the Tariff Commission were to be adopted, it would have the result in many cases of invalidating the President's action as being

beyond the powers given him, or of leaving individual items at the rates of the act, in spite of clear intent to change them to some extent at least. Such would be the result in this case. We have decided that the involved merchandise is *specially* provided for as a form for manufacturing electrical brushes under paragraph 216 of the Tariff Act of 1930. The reductions applied to articles and wares, not specially provided for, cannot affect it, because it *is* specially provided for. If the reduction applied to "other forms" for making brushes does not apply to it, it must remain dutiable at 45 per centum ad valorem as originally provided in the Tariff Act.

We note that parties to the trade agreements have attempted to avoid such anomalous results by the following "General Note" which follows Schedule XX (Concessions by the United States) of the General Agreement on Tariffs and Trade:

1. The provisions of this Schedule shall be construed and given the same effect, and the application of collateral provisions of the customs laws of the United States to the provisions of this Schedule shall be determined, insofar as may be practicable, as if each provision of this Schedule appeared respectively in the statutory provision noted in the column at the left of the respective description of articles.

An identical note appears in the Trade Agreement with the United Kingdom. If the trade agreements are to be construed as if the provisions relating to paragraph 216 actually appeared in paragraph 216, then it follows that identical phraseology must be given identical meaning. See in this connection *B. Altman & Co.* v. *United States*, 224 U. S. 583, which arose under the quite different reciprocity provisions of the tariff act of 1897, but is nevertheless authority for the proposition that identical terms in a tariff act should not have different meanings.

We do not decide here that there are no circumstances under which words used in a tariff act will be given a different meaning when used in a trade agreement, as might possibly be the case where the specific intent of the negotiators is clear and manifest; at this time we decide only that the evidence presented here of a different interpretation by the Tariff Commission is insufficient to overcome the presumption that the negotiators intended their language to mean the same thing as the identical language used in the tariff act.

In arriving at this conclusion, we do not overlook the case of *United States* v. *Weigert-Dagen et al.*, 39 C. C. P. A. (Customs) 58, C. A. D. 464, and similar cases where resort was made to the "Digests of Trade Data" to resolve the meaning of an ambiguous term. As stated in the *Weigert-Dagen* case, the information contained in such digests is not binding upon the court, but must be examined in the light of all the available evidence of the negotiators' intent. Also, in the *Weigert-Dagen* case, and in the other cases where controlling effect

was given to the information given in the "Digests," the ambiguous language was not identical with that in the tariff act, but new language had been added in the trade agreement.

There remains for disposal only a contention by appellee that the imported mixture of powders and binder must be manufactured into blocks before it can be manufactured into brushes, and "is therefore one step behind the carbon block form which, in the final analysis, is the article used in producing electrical brushes." Appellee's argument might be persuasive in other contexts, but can have no significance in regard to the pertinent portion of paragraph 216. The language provides for plates, rods, and other forms *"wholly or partly manufactured,"* clearly indicating that all stages or steps in the manufacturing process are covered.

Having concluded that the phrase "and other forms" was intended by Congress to have a meaning broad enough to cover the involved importation, and that the identical language used in trade agreements was intended to have the same meaning, it follows that the protest should be sustained, and the decision of the Customs Court must be, and is *reversed.*

JOHNSON and COLE, J. J., dissent.

———

O'CONNELL, Judge, specially concurring:

Trade Digests included in the Summary of Tariff Information constitute material of which the court may take judicial notice. The fact that the Summary was not issued to the public until after the signing of the trade agreement is not of controlling importance because, in general, the essential information contained therein was before those responsible for fixing the rates of duty during their actual determination. *United States* v. *Good Neighbor Imports, Inc.,* 33 C. C. P. A. (Customs) 91, C. A. D. 321. Where it appears, however, as in the case at bar, that the essential information relied upon was not included in the digests, and was not before the negotiators of the Trade Agreement, either explicitly or inferentially, as the Chief Judge points out, the majority of the Customs Court had no basis for its judgment in the court below.