# B. ALTMAN & CO. *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 208.    Argued April 25, 26, 1912.—Decided May 13, 1912..

This court will entertain a direct review of the judgment of the Circuit Court under § 5 of the Circuit Court of Appeals Act of 1891, in a . revenue case which involves not only questions of classification and amount of duty thereunder, but also questions as to the constitutionality of a law of the United States or the validity or construction of a treaty under its authority.

Where the importer throughout has insisted that the merchandise is dutiable at the rate fixed by a reciprocal agreement entered into by the United States under § 3 of the Tariff Act of 1897, there is a direct appeal to this court under § 5 of the Circuit Court of Appeals Act of 1891, provided such agreement is a treaty.

Generally a treaty is a compact between two or more independent nations with a view to the public welfare, but *quære* whether under the provisions of the Constitution of the United States an agreement is a treaty unless made by the President and ratified by two-thirds of the Senate.

In construing the Circuit Court of Appeals Act of 1891, the intent of Congress will be considered, and it was manifestly to permit rights and obligations resting on international compacts and their construction to be passed on by this court.

A reciprocal agreement between the United States and a foreign nation entered into and proclaimed by the President under authority of § 3 of the Tariff Act of 1897 is a treaty within the meaning of § 5 of the Circuit Court of Appeals Act.

A term used in a reciprocal agreement made under § 3 of the Tariff Act of 1897 will be construed in the same way that such term is defined in the act itself; and so *held* that the word "statuary" used in the reciprocal agreement of May 30, 1898, with France of,30 Stat. 1774, includes only such statuary as is cut, carved, or otherwise wrought by hand as the work of a sculptor.

172 Fed. Rep. 161, affirmed.

THE facts, which involve the construction of the tariff acts and of the reciprocal agreement with· France of May 30, 1898, are stated in the opinion.

*Mr. Henry J. Webster*, with whom *Mr. John K. Maxwell* and *Mr. Howard T. Walden* were on the brief, for plaintiff in error:

The so-called agreement with France is a treaty.

The President and Senate undoubtedly have complete control of the making of treaties, so long as they refuse to join with the House of Representatives in making a treaty by act of Congress. There is a practical limitation to their power of carrying treaties into execution in cases where an act of Congress is necessary for that purpose, but that is a separate matter from their power to *make* treaties, which is unqualified. The House, therefore, has no right to demand any agency or share in the making of treaties, but has only a right to demand a share in the legislation, if any be necessary, to make them effective. If, however, the President and Senate voluntarily join with the House in the enactment of a law which authorizes the making of a treaty, and provides for its taking effect upon proclamation by the President, such action

includes the approval of the President, the advice and consent of the Senate, and the legislation required to put it into execution.

The power to pass a law authorizing the President to make a treaty reducing rates of duty in consideration of reciprocal reductions by a foreign nation, is an exercise of the power conferred by Art. I, § 8, to make all laws necessary and proper for carrying into execution the foregoing powers. *Legal Tender Cases*, 12 Wall. 457, 533, 538; quoting from *Fisher* v. *Blight*, 2 Cranch, 358.

The mere designation of the instrument by another name, even by Congress and the President, does not prevent its being a treaty, if it is such in substance. *Pollock* v. *Farmers' L. & T. Co.*, 157 U. S. 429, quoted with approval in *Fairbank* v. *United States*, 181 U. S. 283.

Treaties have quite frequently been denominated conventions, but that does not change their nature as treaties. *Bartram* v. *Robertson*, 122 U. S. 116, 118.

If a treaty remains a treaty when called a convention, it would seem equally to remain a treaty when called an agreement.

Congress has referred to the Hawaiian treaty in two instances as a convention, and in two others as a treaty. Act Aug. 15, 1875, 19 Stat. 200; Act Mar. 3, 1891, 26 Stat. 844; Act Aug. 27, 1894, par. 182½, 28 Stat. 521; Act July 24, 1897, par. 209, 30 Stat. 168.

In the general sense and without special reference to the Constitution and laws of the United States, the so-called commercial agreement with France is unquestionably a treaty.

There is no decided case involving directly the question whether a certain instrument was a treaty or not. As to what a treaty is, see *Foster* v. *Neilson*, 2 Pet. 253, 314; *Holmes* v. *Jennison*, 14 Pet. 540; *United States* v. *Rauscher*, 119 U. S. 407; *Whitney* v. *Robertson*, 124 U. S. 190.

This contract with France was between two independent nations; it was a formal contract, written in both French and English, signed by both parties and duly proclaimed by the President and also by the Secretary of the Treasury; it was upon consideration—a promise for a promise; it was for a considerable time and furnished a rule for almost daily action during its continuance; it was for the public welfare, and made in the name of the State, and was actually executed for a period of eleven years, its termination having been directed by § 4, act of August 5th, 1909, 36 Stat. 83.

In the Constitution and laws of the United States, the word "treaty" has no special meaning different from the general definition. *Hauenstein* v. *Lynham,* 100 U. S. 483, 489.

The reason for vesting the power to make treaties in the President and Senate appears to have been simply to secure secrecy and despatch, which, it was recognized, were often necessary, and except for this consideration, the power would doubtless have been expressly vested in Congress as a whole. 2 Madison, Journal of Const. Conv. of 1787, edited by Hunt, 327; Chas. Pinckney, 4 Elliott's Debates in State Conventions on Adoption of Federal Constitution, 253–267.

As to executive and legislative construction, see Annals of Congress, 4th Cong., 1st Sess., pp. 759, 771. See discussion in 1816; the question whether legislation was necessary to carry a certain treaty into effect, the House proposing to pass an act to carry a treaty into effect, to which the Senate disagreed; Annals of Congress, 14th Cong., 1st Sess., pp. 1022, 1057.

For legislative interpretation, see law enacted by Congress in 1872 for making postal arrangements, 17 Stat. 304, now § 398, Rev. Stat., in pursuance of which the treaty of Berne was entered into October 9, 1874, 19 Stat. 577, and was ratified by the Postmaster General by and

with the advice and consent of the President (ib. 588); Cotzhausen v. Nazro, 107 U. S. 215, 217. See also act tantamount to an offer to a foreign nation, which, when accepted by it, constituted a treaty in substance, although not incorporated into one document signed by both parties, and which granted certain rights to Canadian vessels in waters of the United States, to become effective when Canada extended the same privilege to American vessels in Canadian waters. Act of June 19, 1878, 20 Stat. 175, amended May 24, 1890, 26 Stat. 120, and again March 3, 1893, 27 Stat. 683. These were acts of Congress passed by both houses and approved by the President.

The Secretary of the Treasury in official documents has frequently referred to this contract with France, and others made in the same manner and by the same authority with other countries, as treaties (Treas. Dec. 19405, 21886, 22277, 22353, 23954). The Board of General Appraisers has done the same (T. D. 23166, 24971, 25442, 26208, 29070, 30490, 31202). This oft-repeated use of the word "treaty" as applied to these so-called commercial agreements indicates a general understanding in the executive departments that they are treaties.

In some court decisions this particular agreement with France has been called a treaty, without discussion as to the exact meaning of the word. Nicholas v. United States, 122 Fed. Rep. 892; Migliavacca Wine Co. v. United States, 148 Fed. Rep. 142; Shaw v. United States, 1 Cust. App. 426, also reported T. D. 31500.

Section 3 of the act of 1897, supra, was an expression of the advice and consent not only of the Senate, but also of the House of Representatives.

The Constitution, in conferring the power to make treaties, does not prescribe the time or method of the Senate giving its advice and consent. It can as well be given before negotiations as after, and certainly the con-

sent of the whole Congress is not inferior to the consent of the Senate alone. *Green* v. *Biddle*, 8 Wheat. 1, 85; *Poole* v. *Fleeger*, 11 Pet. 185, 209, affirming 1 McLean, 185; *Virginia* v. *West Virginia*, 11 Wall. 39, 59.

The supreme legislative authority in the United States is Congress. Const., Art. I, § 1. The power of the President and Senate to make treaties is necessarily subordinate in some respects.

A treaty can be repealed by an act of Congress. *Head Money Cases*, 112 U. S. 580, 599.

The more or less general use of the word "agreement" instead of "treaty" as applied to these reciprocal commercial contracts is easily accounted for.

It is within the spirit and intent of the act of March 3, 1891, *supra*, to give this court jurisdiction in this case. *Durousseau* v. *United States*, 6 Cranch, 307, 314.

If the agreement with France is a treaty, this court has jurisdiction of the entire case. *Horner* v. *United States*, 143 U. S. 570, 576.

The term "statuary" in the treaty with France includes all kinds or species of statuary, of any material and made by any process.

A name of an article used in a statute without qualification includes that article in all its forms and species. *Chew Hing Lung* v. *Wise*, 176 U. S. 156, 160; *Schoelkopf* v. *United States*, 71 Fed. Rep. 694.

There is absolutely nothing on the face of the treaty to indicate any limitation of the term "statuary" to a particular class of statuary.

Where a treaty admits of two constructions, one restrictive as to the rights that may be claimed under it, and the other liberal, the latter is to be preferred. *Shanks* v. *Dupont*, 3 Pet. 242. Such is the settled rule in this court. *Hauenstein* v. *Lynham*, 100 U. S. 483, 487; *Chow Heong* v. *United States*, 112 U. S. 536, 539; *New York Indians* v. *United States*, 170 U. S. 1, 23.

The published presidential proclamation of the treaty with France, 30 Stat. 1774; T. D. 19405, contains no intimation that the statuary therein referred to was to be only professional productions of sculptors.

Although the particular amendment adopted by the Senate, and not included in the treaty and proclamation, did not have the approval of the President, it was not, therefore, ineffective as an amendment. A strict and technical view would have been that the treaty as finally ratified and proclaimed by the President did not have the full and complete consent of the Senate, and, therefore, was no treaty. But the court apparently did not regard this view with sufficient seriousness to even mention it.

Obviously the treaty must contain the whole contract between the parties. *New York Indians Case, supra; Fourteen Diamond Rings,* 183 U. S. 176; *Meigs* v. *McClung's Lessee,* 9 Cranch, 11.

The intention should not be imputed to Congress to limit the statuary covered by § 3 by a clause "kept in the background," in the midst of a long and involved statute. The provision on which the Government relies is obscurely placed as a proviso to par. 454 of the Tariff Act of 1897 (30 Stat. 194).

The office of a proviso, generally, is either to except something from the enacting clause, or to qualify or restrain its generality, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the legislature to be brought within its purview. *Minis* v. *United States,* 15 Pet. 423, 445; *United States* v. *Dickson,* 15 Pet. 141, 165; *White* v. *United States,* 191 U. S. 545, 551.

Section 3 is a thing apart. It did not, *ex proprio vigore,* fix any rate of duty, or provide for the free admission of any articles. It could not operate contemporaneously with §§ 1 and 2, as to the same importation. The moment it is effective, §§ 1 and 2 are suspended *pro tanto.* *Barber*

v. *Schell*, 107 U. S. 617, 620; *Nicholas* v. *United States*, 122 Fed. Rep. 892; *United States* v. *Luyties*, 124 Fed. Rep. 977; *United States* v. *Wile*, 124 Fed. Rep. 1023; *S. C.*, 130 Fed. Rep. 331.

The cases of *Richard & Co.* v. *United States*, 158 Fed. Rep. 1019, and *Shaw* v. *United States*, 158 Fed. Rep. 648, 212 U. S. 559, can be distinguished.

*Mr. Assistant Attorney General Wemple*, with whom *Mr. Charles E. McNabb*, Assistant Attorney, and *Mr. Frank L. Lawrence*, Special Attorney, were on the brief, for the United States:

This court has no jurisdiction of the appeal in any view of the case.

A reciprocal commercial agreement under § 3 of the Tariff Act of 1897 is not a treaty within the meaning of the Constitution of the United States and § 5 of the Judiciary Act of March 3, 1891, c. 517, 26 Stat. 826, 828.

As such agreements cannot legally extend the scope of the law, the agreement with France cannot be construed to embrace statuary not covered by said § 3.

The merchandise in suit, not being wrought by hand from metal and the professional production of a statuary or sculptor only, is excluded from the operation of § 3 by the express limitation in paragraph 454 of the same act.

No question is presented of which this court has jurisdiction upon direct appeal from the Circuit Court.

The sovereign is not suable in its own courts without its expressed consent. This is a suit against the United States, and general acts do not apply to the sovereign unless the sovereign be mentioned therein. *Cheatham* v. *United States*, 92 U. S. 85.

Jurisdiction is unwarranted by the record, and unsupported by the law. The commercial agreement is not a treaty. In a broad sense perhaps all treaties are

agreements or contracts, the word "agreement" being sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects, *Virginia* v. *Tennessee,* 148 U. S. 503, 517, but all agreements or contracts are not treaties. "Treaty" is a word of superior dignity; "agreement" is not to be taken as generic, but as comprehending only what is inferior.

This particular agreement is not a treaty within the meaning of the Constitution and of the Judiciary Act of 1891. *Holmes* v. *Jennison,* 14 Pet. 540, 570.

There is a distinction between a treaty and an act of Congress.

In this country a treaty is something more than a contract, for the Federal Constitution declares it to be the law of the land. *Haver* v. *Yaker,* 9 Wall. 32, 35; *Head Money Cases,* 112 U. S. 580, 598; *United States* v. *Rauscher,* 119 U. S. 407.

The commercial agreement was not a law; the law was § 3 of the Tariff Act of 1897. The agreement could legally add nothing to that. *United States* v. *Wile,* 130 Fed. Rep. 331; *Richard* v. *United States,* 151 Fed. Rep. 954; *S. C.,* 158 Fed. Rep. 1019.

Upon its proclamation one rate of duty was substituted for another, the latter being "suspended" by the law during the continuance of the agreement.

Authority to ascertain and declare the event or state of things upon which a law shall take effect may be constitutionally delegated to the President, but he is restricted to that. No legislative power can be delegated. *Field* v. *Clark,* 143 U. S. 649, 682; *Brig Aurora,* 7 Cranch, 382, 388.

It is different with treaties. They are made by the President by and with the advice and consent of the Senate. Concurrence of two-thirds of the Senators present is essential.

It is incompatible with the Constitution to regard an agreement under § 3 of the Tariff Act of 1897 as a treaty upon the theory that the legislative assent was signified in advance rather than after negotiation, when such assent is implied from a majority vote, as in the case of the Tariff Act of 1897. The vote in the Senate stood: Yeas 38, nays 28, not voting 23 (Cong. Rec., 55th Cong., 1st sess., vol. 30, pt. 3, p. 2447). That is less than "two-thirds of the Senators present," and a treaty to be one in the constitutional sense can only thus be made by the President and the Senate. *Head Money Cases*, 112 U. S. 580, 599; *New York Indians* v. *United States*, 170 U. S. 1, 23; *De Lima* v. *Bidwell*, 182 U. S. 1, 194, 195.

A resolution adopted by the Senate by less than two-thirds of a quorum was held without legal significance in respect to the intention of the Senate in the ratification of the treaty of peace with Spain. *Fourteen Diamond Rings* v. *United States*, 183 U. S. 176, 183. *Cotzhausen* v. *Nazro*, 107 U. S. 215, cited by appellants, did not decide that a postal agreement is a treaty within the meaning of the Constitution, and may be made without the concurrence of two-thirds of the Senators present. Whether or not it was a treaty in the constitutional sense was not in issue and not decided.

Improper use of terms is not uncommon in legislation. See § 1955 of the Revised Statutes, where "exportation" to Alaska from any port in the United States is spoken of. There can be no doubt that the word "exportation" was there irregularly used, and should not be deemed a legislative interpretation or use extending it to shipments which are not exportations within the meaning of the Constitution.

The commercial agreement with France was negotiated as an agreement and not as a treaty. The word "treaty" nowhere appears, but the word "agreement" is frequently used. The certificate of the Secretary of State, further-

more, refers to it as a "reciprocal commercial agreement."

There is implied legislative declaration in the very act under discussion that agreements of the sort mentioned in § 3 are not treaties. See § 4 of the same act, 30 Stat. 204, 205.

Both "agreement" and "concession," as far as the President is concerned, had reference only to merchandise imported into the foreign county from the United States. The law designated the articles that might be imported into the United States from the foreign country and specified the duty to be collected in lieu of the ordinary rates, expressly suspended. The President could not add to the articles nor change the rates of duty. Congress left neither to his discretion.

The word "statuary" means the same in § 3 as in paragraph 454 of the Tariff Act of 1897. *Nicholas* v. *United States,* 122 Fed. Rep. 892; *Richard* v. *United States,* 151 Fed. Rep. 954.

The same words occurring in different parts of a statute are to be taken in the same sense. *Swan & Finch Co.* v. *United States,* 190 U. S. 143, 145, 146; 17 Opin. Atty. Gen. 579; 21 *id.* 501; 23 *id.* 418; *Reiche* v. *Smythe,* 13 Wall. 162, 165.

MR. JUSTICE DAY delivered the opinion of the court.

This is an appeal from an order of the Circuit Court of the United States for the Southern District of New York, affirming a decision of the Board of General Appraisers, which sustained an assessment of duty by the collector at the port of New York upon a certain bronze bust imported by the appellants, B. Altman & Co.

The bust was imported from France and was assessed a duty of 45 per cent. ad valorem under paragraph 193 of the Tariff Act of 1897 (30 Stat. 151, 167), which covers articles or wares not specially provided for in the act,

composed wholly or in part of metal, and whether partly or wholly manufactured. A protest was filed by the importers, in which they contended that the bust should be classed as statuary under the commercial reciprocal agreement with France (30 Stat. 1774), which was negotiated under the authority contained in § 3 of the Tariff Act of 1897 to make reciprocal agreements with reference, among other articles, to "paintings in oil or water colors, pastels, pen and ink drawings, and statuary." A considerable amount of testimony was taken before the Board of General Appraisers, and it held that the bust was cast in a foundry by mechanics from a model furnished by the artist, and that the artist did little or no work upon the casting, and overruled the protest, on the authority of *Richard* v. *United States*, 158 Fed. Rep. 1019, and *Tiffany* v. *United States*, 71 Fed. Rep. 691.

The Circuit Court affirmed the order and decision of the Board of General Appraisers on the authority of the same cases, and an appeal was prayed to this court, which was allowed, the Circuit Judge certifying that the questions involved in the case were, in his opinion, of such importance as to require a review of. the decision of the court by the Supreme Court of the United States.

Certain errors were assigned, and the following are insisted upon in this court:

"1. In not holding that the commercial agreement between the United States and France, as proclaimed by the President of the United States (T. D. 19405 and 30 Stat. 1774), was to be in full scope according to its language without being in any way restricted or modified by the definition contained in paragraph 454, section 1, of the Tariff Act of July 24, 1897, but which definition was not embodied either in the commercial agreement itself or in the President's proclamation thereof.

"2. In not holding that the term 'statuary' as used in section 3 of the Tariff Act and in said commercial agree-

ment with France or the President's proclamation thereof, was not subject to the definition contained in paragraph 454, Schedule N, Section 1, of said Tariff Act.

"3. In not holding the merchandise dutiable at 15 per cent. ad volorem under section 3 of the Tariff Act and the commercial agreement with France and the President's proclamation thereof.

"7. In holding the merchandise dutiable at 45 per cent. under paragraph 193 as manufactured metal.

"8. In affirming the decision of the Board of General Appraisers.

"9. In not reversing the decision of the Board of General Appraisers and of the Collector of the Port and holding the merchandise dutiable at either 15 per cent. under section 3 and the Commercial Agreement with France, as proclaimed by the President."

A motion was made by the Solicitor General to dismiss the appeal. That motion was postponed for hearing with the case upon its merits. To support the motion it is contended on behalf of the United States that no question is involved which, under § 5 of the Circuit Court of Appeals Act of March 3, 1891, 26 Stat. 826, 827, 828, c. 517, entitles the appellant to a direct appeal from the Circuit Court to this court. By the Circuit Court of Appeals Act that court is given jurisdiction to review appeals in revenue cases and by the sixth section of the act judgments of that court in such cases are made final.

Prior to June 10, 1890, the right to a review of revenue cases was by appeal to this court from the Circuit Court. (R. S., § 699.) By the act of June 10, 1890, 26 Stat. 131, c. 407, special provision was made for the review of revenue cases where the owner, importer, etc., was dissatisfied with the decision of the Board of General Appraisers. Under § 15 of that act an appeal was given from the decision of the Board of General Appraisers "as to the construction of the law and the facts respecting the classi-

fication of such merchandise and the rate of duty imposed thereon under such classification . . . to the circuit court of the United States within the district in which the matter arises, for a review of the questions of law and fact involved in such decision." And it was provided that the decision of the Circuit Court should be final, unless the court should be of the opinion that the question involved was of such importance as to require a review of such decision by the Supreme Court of the United States, in which case an appeal was allowed to this court. It is to be observed that the cases herein referred to are strictly revenue cases, in which the decision concerns the classification of merchandise and the rate of duty imposed thereon under the classification made. This act remained in force until amended by the act of May 27, 1908, 35 Stat. 403, c. 205, to which we shall have occasion to refer later. In the meantime, on March 3, 1891, the Circuit Court of Appeals Act was passed, giving a direct appeal in certain cases to this court. So much of § 5 as is pertinent to this case provides:

"That appeals or writs of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court in the following cases:

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

In any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority, is drawn in question."

The Circuit Court of Appeals Act did not repeal the revenue act to which we have referred, but broadly provided for direct appeal to this court from the Circuit Court in any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty, etc., was drawn in question.

We think the cases show that this court, so far as it has had occasion to deal with the question, has permitted direct appeal to this court in all revenue cases where, in

addition to the objection to classification of merchandise
and rate of duty imposed, a real question under § 5 has
been involved.

In *Anglo-Californian Bank* v.. *United States,* 175 U. S.
37, an attempt was made to take an appeal to this court
from a judgment of the Circuit Court of Appeals, affirm-
ing the decree of the Circuit Court, which overruled the
decision of the Board of General Appraisers, and it was
held that the appeal would not lie. In the course of the
opinion Mr. Chief Justice Fuller said that under the act of
June 10, 1890, a direct appeal would lie to this court if the
Circuit Court certified that the question involved was of
such importance as to require a review of such decision
and decree by this court, but the Chief Justice pointed out·
that the attempted appeal was not an appeal from the
Circuit Court directly to this court, nor did the case fall
within any of the classes of cases enumerated in § 5, in
which a direct appeal to this court would lie, and, more-
over, that the Judiciary Act of March 3, 1891, prescribed
a different rule as to the prosecution of appeals. While the
question here made was not directly involved in that
case, it is to be fairly inferred that the court would have
sustained an appeal had the case been brought from the
Circuit Court within the terms of § 5 and upon one of the
grounds there stated.

In the case of *Spreckels Sugar Ref. Co.* v. *McClain,* 192
U. S. 397, an appeal was allowed from the Circuit Court
of Appeals to this court, and, concerning what were
revenue cases within the meaning of the Circuit Court of
Appeals Act, under the sixth section, making that court's
judgment final in cases arising under the revenue laws, this
court said (p. 408):

"So far as we now remember, this precise point has not
heretofore arisen for our determination. Looking at the
purpose and scope of the act of 1891, we are of opinion that
the position of the Government on this point cannot be

sustained. It rests upon an interpretation of the act that is too technical and narrow. The meaning of the words 'arising . . . under the revenue laws,' in the sixth section, is satisfied if they are held as embracing a case strictly arising under laws providing for internal revenues and which does not, by reason of any question in it, belong also to the class mentioned in the fifth section of that act."

While the *Spreckels Case* was commented on and limited in some measure in the subsequent case of *Macfadden* v. *United States*, 213 U. S. 288, nothing was said to indicate any disagreement with the definition of this court as to what was a case arising under the revenue laws, and the court said that the *Spreckels Case* was held not to be final in the Circuit Court of Appeals because the original jurisdiction involved the construction of the Constitution of the United States, as well as a strictly revenue question, and that, thus construed, it was consistent with all the decisions.

From the principles laid down in these cases, we think it is plain that this court will entertain a direct review in a revenue case which involves not only questions of classification and amount of duty thereunder, as specified in the revenue act to which we have referred, but also a question under the fifth section as to the constitutionality of a law of the United States or the validity or construction of a treaty under its authority.

Nor did the amendment of the revenue act by the act of May 27, 1908, affect any change in this respect, for its provisions, with respect to the review of the decision of a Circuit Court, are substantially identical with the act of June 10, 1890, except that the decision of a Circuit Court is made final, unless the court certifies that it is of the opinion that the question involved is of such importance as to require a review of such decision by the Circuit Court of Appeals, the decree of which may be reviewed in the

Supreme Court in any of the ways provided in cases arising under the revenue laws by the act approved March 3, 1891, being the Circuit Court of Appeals Act; but that act (Amendment of May 27, 1908), like the act of June 10, 1890, provides only for the review of decisions of the Board of General Appraisers "as to the construction of the law and the facts respecting the classification of such merchandise and the rate of duty imposed thereon under such classification." We do not think that this act changes the effect of the Circuit Court of Appeals Act and operates to prevent an appeal here in cases really involving the Constitution of the United States or the construction of a treaty.

The Government relies, in support of its motion to dismiss, on *Shaw* v. *United States*, 212 U. S. 559. In that case, however, the appeal was undertaken to be made directly from the Circuit Court because of an alleged deprivation of constitutional right, and because of the construction of a reciprocal agreement made with Italy under the Tariff Act of 1897. The case was dismissed on the authority of *American Sugar Ref. Co.* v. *United States*, 211 U. S. 155, in which it was held that the only real substantial controversy concerned the construction of the Tariff Act of 1897. An examination of the record in the *Shaw Case* shows that no real constitutional question was involved and that the assessment of duty was in accordance with the reciprocal commercial agreement with Italy. See *Shaw* v. *United States*, 158 Fed. Rep. 648.

The report of the *American Sugar Refining Company Case*, to which the court referred in the *Shaw Case* and which was decided at the same term (211 U. S. 155), shows that it was an attempt to appeal directly from the Circuit Court, and that this court did not think that the constitutional question made in the case had any real merit, but that the only question was a construction of the Tariff Act relating to the collection of duty upon sugar, and

therefore this court had no jurisdiction by direct appeal. In this connection this court said (p. 161):

"The present direct appeal to this court is a mere attempt to obtain a reconsideration of questions arising under the revenue laws and already determined by the Circuit Court of Appeals [upon a former appeal] in due course. Such direct appeals [from a circuit court], under § 5 of the act of 1891, cannot be entertained unless the construction or application of the Constitution of the United States is involved."

An examination of the record in the present case shows that the importer throughout insisted that the statuary was dutiable at 15 per cent. ad valorem under the reciprocal agreement between the United States and France entered into under the authority of § 3 of the Tariff Act of 1897. If this contention be correct, then the assessment was wrong, and, if the reciprocal agreement referred to was a treaty within the meaning of § 5 of the Circuit Court of Appeals Act, then there was a right of direct appeal to this court.

Generally, a treaty is defined as "a compact made between two or more independent nations with a view to the public welfare." 2 Bouvier's Dictionary, 1136. True, that under the Constitution of the United States the treaty making power is vested in the President, by and with the advice and consent of the Senate, and a treaty must be ratified by a two-thirds vote of that body (Art. II, § 2), and treaties are declared to be the supreme law of the land (Art. VI); but we are to ascertain, if possible, the intention of Congress in giving direct appeal to this court in cases involving the construction of treaties. As is well known, that act was intended to cut down and limit the jurisdiction of this court, and many cases were made final in the Circuit Court of Appeals which theretofore came to this court, but it was thought best to preserve the right to a review by direct appeal or writ of error from a Circuit Court in certain matters of importance, and, among others,

those involving the construction of treaties. We think that the purpose of Congress was manifestly to permit rights and obligations of that character to be passed upon in the Federal court of final resort, and that matters of such vital importance, arising out of opposing ·constructions of international compacts, sometimes involving the peace of nations, should be subject to direct and prompt review by the highest court of the Nation. While it may be true that this· commercial agreement, made under authority of the Tariff Act of 1897, § 3, was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the· representatives of two sovereign nations and made in the name and on behalf of the contracting countries, and dealing with important commercial relations between the two countries, and was proclaimed by the President. If not technically a treaty requiring ratification, nevertheless it was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President. We think such a compact is a treaty under the Circuit Court of Appeals Act, and, where its construction is directly involved, as it is here, there is a right of review by direct appeal to this court.

Coming to· the merits, the contention of the importer is that the word "statuary" should receive its popular construction, and that the term should include such a piece of cast bronze as is here involved, but we think the definition and authority of the act cannot be ignored in this connection.

The negotiation was entered into between the representatives of the two countries· under the authority of § 3 of the Tariff Act of 1897, as we have seen. In that act the term "statuary" is defined as follows: "The term 'statuary' as used in this act shall be understood to include only such statuary as is cut, carved, or otherwise wrought

by hand from a solid block or mass of marble, stone, or alabaster, or from metal, and as is the professional production of a statuary or sculptor only." The reciprocal agreements were authorized with reference to "paintings in oil or water colors, pastels, pen and ink drawings, and statuary." We think this must have reference to statuary as already defined in the act, which both parties understood was the source of their authority to negotiate the reciprocal commercial agreement in question, for the agreement provides:

"It is reciprocally agreed on the part of the United States, in accordance with the provisions of section 3 of the United States Tariff Act of 1897, that during the continuance in force of this agreement the following articles of commerce, the product of the soil or industry of France, shall be admitted into the United States at rates of duty not exceeding the following, to wit:

\*     \*     \*     \*     \*     \*     \*     \*

"Paintings in oil or water colors, pastels, pen-and-ink drawings, and statuary, fifteen per centum ad valorem."

Thus in its terms the agreement was made under the authority and in accordance with § 3 of the Tariff Act of 1897, in which very act the term statuary, as used therein, was specifically defined, as we have already stated.

We think that it is clear that the Board of General Appraisers and the Circuit Court did not err in finding that this bronze statue was not wrought by hand from metal. On the other hand, the testimony is clear that the statue was cast from metal by artisans employed for that purpose, and was very little touched, if at all, in its finishing, by the professional designer.

The result is that the judgment must be

*Affirmed.*