**BERCUT–VANDERVOORT & CO., Inc.**

v.

**UNITED STATES.**

**C. D. 1877; Protest No. 192781–K.**

United States Customs Court
Third Division.

April 30, 1957.

Lawrence & Tuttle, San Francisco, Cal. (George R. Tuttle, San Francisco, Cal., of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon, William J. Vitale, Mollie Strum, Richard H. Welsh, Alfred A. Taylor, Jr., and Samuel D. Spector, New York City, trial attorneys), for defendant.

Before JOHNSON, DONLON, and FORD, Judges.

JOHNSON, Judge.

The merchandise involved in this case consists of 90-proof London dry gin, exported from Holland on July 25, 1951, placed in Foreign Trade Zone No. 3 at San Francisco, and entered for consumption at the port of San Francisco on August 19, 1952. It was assessed with duty at the rate of $1.25 per proof gallon under paragraph 802 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 802, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, and with internal revenue tax at the rate of $10.50 per wine gallon under section 2800 (a) (1) of the Internal Revenue Code of 1939, as amended by 65 Stat. 524, 26 U.S.C. § 2800(a) (1).

No question has been raised as to the rate or amount of duty or as to the rate of internal revenue tax, but it is claimed that, in view of Articles II and III of the General Agreement of Tariffs and Trade, T.D. 51802, 61 Stat. A14, A18, the tax imposed should not exceed that

imposed in respect of the like domestic product and that it should have been assessed on the basis of the proof gallon and not the wine gallon.

Section 2800(a) (1) of the Internal Revenue Code of 1939, as amended, provided, at the time of importation:

"There shall be levied and collected on all distilled spirits in bond or produced in or imported into the United States an internal revenue tax at the rate of $10.50 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon, to be paid by the distiller or importer when withdrawn from bond. On and after April 1, 1954, the rate of tax imposed by this paragraph shall be $9 in lieu of $10.50."

Article II, section 2 of the General Agreement on Tariffs and Trade, T.D. 51802, 61 Stat. A15, provides:

"2. Nothing in this Article shall prevent any contracting party from imposing at any time on the importation of any product

"(a) a charge equivalent to an internal tax imposed consistently with the provisions of paragraph 1 of Article III in respect of the like domestic product or in respect of an article from which the imported product has been manufactured or produced in whole or in part; * * *."

[The reference to "paragraph 1 of Article III" in the above provision was amended to read "paragraph 2 of Article III" by the Protocol Modifying Part I and Article XXIX of the General Agreement on Tariffs and Trade, signed September 14, 1948, and entering into force for the United States, September 24, 1952, T.D. 52167; 3 United States Treaties and Other International Agreements 5355. The effective date for the United States was subsequent to the date of entry herein but prior to the date of liquidation. This change was neces-

sitated by the prior modification of Article III, *infra.*]

Article III, section 2 of the General Agreement on Tariffs and Trade, as modified by the Protocol Modifying Part II and Article XXVI of the General Agreement on Tariffs and Trade, signed September 14, 1948, and entering into force for the United States, December 14, 1948, T.D. 52167; 62 Stat. pt. 3 p. 3679, provides:

"2. The products of the territory of any contracting party imported into the territory of any other contracting party shall not be subject, directly or indirectly, to internal taxes or other internal charges of any kind in excess of those applied, directly or indirectly, to like domestic products. * * *"

Seven witnesses were called at the trial, and the depositions of three persons, taken in Holland, were received in evidence.

According to the depositions, the merchandise involved herein was produced by Wynand Fockink, Amsterdam, Holland, from grain neutral spirits, having a proof of 190–193, purchased from Spiritus Verkoopkantoor of Delft, sales agent of the Royal Netherlands Distilleries. The neutral spirits were redistilled, water, herbs, and berries added, and a London dry gin of 178 proof was created. Said gin was later reduced in alcoholic content to 90 proof, solely by the addition of water.

Several of the witnesses who were familiar with the imported merchandise and other dry gins of 90 or 94.4 proof, both domestic and imported, testified that such gins are similar in taste, color, and odor, and are used for the same purposes, chiefly in mixed drinks. It was pointed out that they all possess the taste and odor of juniper berries.

Frank L. Neisler, superintendent, American Distilling Co. of Sausalito, Cal., and Pekin, Ill., described the method of production of his company's gin (Burton's 94.4 proof) as follows: Neutral spirits of 190 proof are distilled from

grain. After testing for purity, the proof is reduced to 120 by the addition of water, and the botanicals, principally juniper berries and coriander seed, are added. The mixture is then redistilled into gin of 158 proof. That product goes into packages or storage tanks in a bonded warehouse in Sausalito. When it is withdrawn from bond, internal revenue tax is paid. It is then dumped in a bottling plant, where it is reduced in proof to 94.4 by the addition of water.

The witness testified that all gin produced at the Sausalito plant is withdrawn at 100 proof or more, and tax is paid on the proof-gallon basis. If it were under 100 proof, tax would be paid on the wine gallon. In the witness' experience, the tax was charged against gin produced at the Sausalito distillery on the wine-gallon basis only once, when a mistake was made by the technician in lowering the proof below 100.

Hugh Mair, plant manager of the Distillers Co., Ltd., of Linden, N. J., testified that his plant produces London dry distilled gins, including Gordon's, Booth's, Boord's, and others. Such gins are produced from 190-proof grain neutral spirits, purchased from Commercial Solvents of Terre Haute, Ind., and Midwest Solvents of Hutchinson, Kans. The spirits are stored until needed in the production of gin, at which time they are pumped into a scale tank, weighed, gauged, and the tax computed and paid. The strength of the gin is then reduced by the addition of water; juniper berries, coriander seeds, and other ingredients are added, and the whole redistilled. The several gins his company makes are sold at 85, 90, and 94.4 proof.

Every time his firm withdraws neutral spirits from bonded warehouse, they are over 100 proof, and tax is paid on the proof-gallon basis.

Lester R. Rodenburg, employed by National Distillers as regional production manager for an area covering Cincinnati, Peoria, Louisville, and Frankfort, testified that his firm manufactures gin, known as Gilbey's, in the Gilbey Distillery in the Cincinnati division. Grain neutral spirits are produced at the registered distillery of National Distillers at Carthage and are transferred by pipeline in bond to the registered distillery of Gilbey. The neutral spirits are created at 190 proof plus. When needed for the production of gin, they are placed in the gin still with water, juniper berries, and other ingredients, and distilled. The gin produced is over 100 proof and under 160 proof. After it enters the receiving tank, where it is stored, it is reduced to about 101 proof. It is withdrawn from the distillery at that proof, and the tax is paid on the proof-gallon basis. If it were less than 100 proof, tax would be paid on the wine-gallon basis. In the bottling plant, after the tax has been paid, it is reduced to 90 proof by adding distilled water.

The issue in the instant case is whether the internal revenue tax should have been imposed on the imported underproof gin on the proof-gallon basis, instead of the wine-gallon basis, as assessed by the collector.

■ Under section 2800(a) (1) of the Internal Revenue Code, *supra*, an internal revenue tax is imposed on all distilled spirits in bond or produced in or imported into the United States at the rate of $10.50 on each proof gallon or wine gallon when below proof. Such tax attaches to distilled spirits domestically produced as soon as they come into existence, but, where such merchandise is placed in bonded warehouse, the tax is not required to be paid until withdrawal from bond and is based upon the proof at that time. 26 U.S.C. § 2800 (a) (1), and (c). If the merchandise is removed from the place where distilled and not deposited in bonded warehouse, the tax is immediately due and payable. 26 U.S.C. § 2800(b) (2). The tax on imported distilled spirits attaches at the time of importation. United States v. Westco Liquor Products Co., 38 C.C.P.A., Customs, 101 C.A.D. 446.

A wine gallon is defined as a standard United States gallon, containing 231 cubic inches, and a proof gallon is a

wine gallon, containing 50 per centum of alcohol by volume and 50 per centum of water by volume. 26 C.F.R. (1949 edition) sections 186.148 and 186.149. Thus, where distilled spirits are taxable at proof, the tax is $10.50 per standard United States gallon. However, if sufficient water is added to reduce the proof to 90 (45 per centum of alcohol), the total volume is increased, and the tax is assessed on the wine-gallon basis, that is, $10.50 on the total number of standard gallons of merchandise. Plaintiff claims, however, that the merchandise involved herein (which is under proof) should be taxed on the basis, not of its total volume, as imported, but as if it had been at proof when imported, that is, on a less volume. In other words, the tax on 90-proof gin should have been levied on the proof-gallon basis. The tax would then have been 90 per centum of $10.50 on each standard gallon, instead of $10.50, as assessed by the collector.

█ It is evident that plaintiff's claim cannot be sustained under the statute itself. It is contended, however, that the language of the General Agreement on Tariffs and Trade, *supra*, has modified the statutory scheme.

Similar contentions have been before the courts on prior occasions in cases involving other trade agreements. Bohemian Distributing Co. et al. v. United States, 15 Cust.Ct. 121, C.D. 957, appeal dismissed May 29, 1946; Vernon Distributing Co. v. United States, 39 C.C. P.A., Customs, 205, C.A.D. 463.

The Bohemian Distributing Co. case, supra, involved trade agreements with Canada (T.D. 48033; T.D. 49752) and with the United Kingdom (T.D. 49753). The court quoted from the latter, as follows:

"Articles the growth, produce or manufacture of the territories of either High Contracting Party shall, after importation into the territories of the other, be exempt from all internal taxes, fees, charges or exactions other or higher than those payable on or in connection with like articles of domestic or any other origin, * * *."

The imported merchandise was underproof whisky, which had been taxed on the wine-gallon basis. Evidence was presented showing that domestic whisky is withdrawn from warehouse above proof; that tax is paid on the basis of the proof gallon; and that the whisky is thereafter diluted with water and bottled. A witness testified that it was advantageous to withdraw domestic whisky from bond over proof, for the reason that, if under proof, it would be taxed on the wine-gallon basis. Counsel agreed that Scotch whisky is produced over proof and thereafter rectified and reduced below proof, in which condition it is bottled and imported. The court found that imported whisky below proof was not similar to domestic whisky above proof and held that taxation of the imported whisky under section 2800 of the Internal Revenue Code on the wine-gallon basis was not in contravention of the trade agreements with Canada and with the United Kingdom.

The Vernon Distributing Co. case, supra, involved rum, imported from Cuba, below proof. The supplemental trade agreement with Cuba, T.D. 50050, provided:

"The provisions of Article I and Article III of this Agreement and of the third paragraph of this Article shall not prevent the Government of the United States of America from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part."

In its opinion, the court pointed out that section 2800 of the Internal Revenue Code imposed a tax on two distinct products: (1) Distilled spirits over proof and (2) distilled spirits under proof, and that, under the trade agreement, the tax on imported merchandise was to be the

equivalent of that assessed on the like domestic article. The court said (39 C. C.P.A. at page 219):

"Concededly, the rum which appellant imported was below proof—that is, it contained less than 50 per cent alcohol. As distilled from the black strap molasses in Cuba it was 160 degree rum. Had it been imported in that condition, the tax upon it would have been based upon the proof gallon just as the tax upon 160 degree rum produced in the United States, if any such, would have been. It was not so imported. By the addition of water before importation (whether rectified or not) it was reduced to 89 degree rum. The amount of water exceeded the amount of alcohol; hence it was below proof and by the express terms of the statute, supra, it was required that the tax be assessed upon the wine gallon basis which is defined in the regulations as a standard United States gallon containing 231 cubic inches. This, of course, would be true of domestically produced rum in which the amount of water exceeded the amount of alcohol. So there is no discrimination. *To hold with appellant here would have the effect of nullifying an express statutory provision.*" [Italics supplied.]

From the statute and the cases cited, the following conclusions are drawn. The statute levies a tax on two distinct commodities: (1) Distilled spirits above proof and (2) distilled spirits below proof. The tax attaches to domestic merchandise when it comes into existence and is payable when the same is withdrawn from bond in its condition at that time. The tax attaches to foreign merchandise when it is imported and is payable when the merchandise is entered or withdrawn for consumption in its condition at that time. If the merchandise, domestic or foreign, is above proof when the tax is payable, it is assessed at $10.50 per proof gallon. If the merchandise, domestic or foreign, is be-

low proof when the tax is payable, it is assessed at $10.50 per wine gallon. Where a trade agreement provides that imported articles shall not be subject to internal taxes higher than those payable on like domestic articles, the like domestic articles, where distilled spirits under proof are imported, are domestic distilled spirits under proof at the time the tax was payable. Since both such articles are taxable at the same rate, that is, on the wine-gallon basis, there is no discrimination against the foreign product, and the statute is not in contravention of the trade agreements.

The only different factor in the instant case is the language of the General Agreement on Tariffs and Trade, supra, which plaintiff claims constrains another result.

Article II, section 2 of the general agreement, supra, provides that a contracting party may impose a charge on imported merchandise equivalent to an internal tax imposed in respect of the like domestic article. Article III, section 2, supra, provides, further, that imported products "shall not be subject, directly or indirectly, to internal taxes or other internal charges of any kind in excess of those applied, directly or indirectly, to like domestic products."

It is evident that the purpose of this language is to prevent discrimination against imported merchandise by way of internal taxes. That was also the purpose of the provisions in the trade agreements involved in the cited cases. Those cases held that the present statute was not discriminatory and was not in contravention of the trade agreements.

Plaintiff's claim is based primarily on the use of the word "indirectly" in Article III, section 2 of the general agreement, supra. Plaintiff argues that, since the domestic producer of distilled spirits may withdraw them from bond above proof, paying tax on the proof gallon, and thereafter reduce them in proof, the underproof gin that goes into commerce is taxed "indirectly" on the basis of the proof gallon. Therefore, it is claimed that imported underproof gin,

taxed on the wine-gallon basis, is paying an internal tax in excess of that applied indirectly to domestic underproof gin. In other words, foreign underproof gin should be subject to tax as if it were over proof at the time of importation.

This would be in direct contravention of the statute and would be contrary to the well-known principle of customs law that imported merchandise is subject to duty in its condition as imported. United States v. Citroen, 223 U.S. 407, 32 S.Ct. 259, 56 L.Ed. 486; United States v. Lo Curto & Funk, 17 C.C.P.A. Customs, 342, T.D. 43777; Leonard Levin Co. v. United States, 27 C.C.P.A. Customs, 101, C.A.D. 69.

Furthermore, it would result in imported overproof distilled spirits and imported underproof distilled spirits paying tax at the same rate, thus breaking down the express statutory classification. The record herein shows that overproof distilled spirits is an article of commerce distinct from underproof spirits. Therefore, the statutory distinction is a reasonable one.

Where, as here, the taxing statute distinguishes between a product in one condition and the same product in another and different condition, the imported and the domestic products must be compared in their condition at the time the tax is applied. Both imported and domestic distilled spirits are taxable and both are taxable in either of two conditions: (1) When under proof and (2) when over proof. Therefore, distilled spirits, under proof when imported, must be compared with distilled spirits, under proof when withdrawn from bond, since, in both instances, that is the time when the tax is applicable. It is clear that both are taxed on the wine-gallon basis, and there has been no discrimination against the imported merchandise.

The statutory scheme, in fact, is of long standing and has been reenacted by Congress from time to time, most recently in the Internal Revenue Code of 1954, section 5001(a) (1), 26 U.S.C. § 5001(a) (1). On the other hand, the provisions of the General Agreement on Tariffs and Trade, relied on by plaintiff, are general ones applicable to all internal charges of any kind imposed by any of the contracting parties. They are not directed specifically or solely to the internal revenue tax on distilled spirits produced in or imported into the United States. Since the congressional intent has been clearly expressed both before and after the effective date of the general agreement, it is reasonable and proper to conclude that the provisions of the agreement were intended to be and are in accord with, rather than contrary to, the legislative purpose. As we have shown, the statute does not discriminate between domestic and foreign merchandise, but imposes a different rate on two distinct classes of merchandise. Both classes may be imported, and the tax is imposed in accordance with the condition of the merchandise at the time it is entered or withdrawn for consumption. To paraphrase the language of our court of appeals in Vernon Distributing Co. v. United States, supra, to hold with plaintiff here would have the effect of nullifying an express statutory provision.

Plaintiff contends that the statute contains hidden benefits for the domestic producer, on the ground that it permits him to withdraw his merchandise while it is above proof, pay tax on the proof-gallon basis, and reduce the proof thereafter without further tax.

The foreign producer may, of course, export distilled spirits which are above proof and reduce them in this country after payment of the tax. Plaintiff claims, however, that he is not in the same favorable position since, in order to obtain the tax benefit, he must either establish a plant in this country for processing and packaging his merchandise, with all the risks and expenses attendant upon this method, or sell his goods in bulk and let the purchaser process the merchandise, thus depriving the goods of the prestige of having been packaged and placed on the market by the foreign producer.

On the other hand, where the foreign producer chooses to send in his mer-

chandise bottled, ready for the market, he pays the tax only upon the quantity which actually is entered or withdrawn from warehouse for consumption. The domestic producer, who withdraws his merchandise above proof, pays on the proof-gallon basis on the total quantity withdrawn and is entitled to no refund of tax for any loss which may occur thereafter. 26 U.S.C. § 2901(c). Even in the case of loss or destruction in bonded warehouse, allowances are not made under all circumstances, and, in the case of loss by theft, the burden is on the distiller or warehouseman to establish that the loss did not occur as the result of connivance, collusion, fraud, or negligence on his part or on the part of his employees. 26 U.S.C. § 2901(a) and (b). See St. Paul Mercury-Indemnity Co. of St. Paul v. United States, 9 Cir., 156 F. 2d 425; Rogan v. Conterno, 9 Cir., 132 F. 2d 726; Glenmore Distilleries Co. v. Glenn, D.C., 92 F.Supp. 688; Julius Kessler & Co. v. United States, 61 Ct.Cl. 723, certiorari denied 273 U.S. 700, 47 S.Ct. 95, 71 L.Ed. 847.

If, as plaintiff claims, the statutory scheme harbors hidden benefits for the domestic product, it also contains disadvantages. Under plaintiff's theory, there would be a discrimination *in favor of* the foreign product, since it would pay internal revenue tax on the proof-gallon basis on the quantity actually entered or withdrawn for consumption, whereas domestic merchandise would pay the tax on the quantity withdrawn, whether or not all of that quantity were processed and sold for consumption. It is not reasonable to suppose that Congress or the negotiators of the trade agreement intended to discriminate against the domestic product.

For the reasons stated, the protest is overruled. Judgment will be rendered accordingly.

DONLON, Judge (dissenting).

I do not concur. In my opinion, the previous decisions in the Bohemian and Vernon cases, cited by the majority, have little relevance. The situation now before us is different, because the law we are called upon to construe is different. The differences are not unimportant. They are significant.

The tariff provision applicable to this merchandise is a provision of the General Agreement on Tariffs and Trade (GATT), not the binational trade agreements with Great Britain, Canada, and Cuba that were construed in the earlier cases. The internal tax here challenged was laid on this merchandise under the Revenue Act of 1951, legislation that had not yet been enacted at the time the Bohemian and Vernon merchandise was entered.

It is not necessary to consider whether the internal tax here in issue was directly discriminatory against the foreign merchandise. The language of GATT with respect to prohibition of direct discrimination in internal tax does not differ substantially from the similar provisions of the British, Canadian, and Cuban trade agreements that were construed in the Bohemian and Vernon cases. Counsel in those cases seem to have understood that indirect internal tax discrimination was not an issue there. The court found there was no direct internal tax discrimination.

For that matter, plaintiff does not argue that the internal tax laid on this merchandise offends against the GATT ban on direct discrimination. Plaintiff argues and, in my opinion, with merit, that it is indirect discrimination, newly prohibited by GATT, against which this tax offends.

The substance of plaintiff's argument, on the evidence of record, seems to be that this merchandise is foreign underproof gin in bottles, which is sold commercially in competition with domestic underproof gin in bottles; that the instant merchandise was imported in 1952 from the Netherlands and from Great Britain, both of which countries were then parties to GATT, as was also the United States; that this gin was subjected to internal tax higher than the internal tax applied to the like and competitive domestic product, underproof gin

in bottles; that this discrimination was effected, under section 2800(a) (1) of the Internal Revenue Code, by reason of the provisions thereof laying tax on proof and overproof spirits on the proof gallon and on underproof spirits on the wine gallon; that application of these differentials affords a loophole for the discrimination, and this is availed of by the domestic industry; that it is the uniform and well-known practice of the domestic industry to withdraw gin from bond while it is overproof and unbottled, pay internal tax under section 2800(a) (1) on the proof gallon, and, thereafter, merely by adding water and bottling the watered-down gin, a domestic product is obtained which is commercial underproof gin in bottles, and this domestic product is then sold in competition with the imported product; that this is not a casual or occasional occurrence, but the consistently regular advertent practice of the domestic industry; that it has the effect of giving the domestic product the advantage of lower internal tax than the imported product pays; that internal tax is applied, under section 2800(a) (1), indirectly, to domestic commercial underproof gin in bottles at a rate more favorable than the internal tax applied directly to the like imported product, foreign commercial underproof gin in bottles, for the reason that tax is laid on the imported product on the wine gallon and, by indirection, on the domestic product on the proof gallon; that this is a discrimination effected indirectly by application of section 2800(a) (1), and that it is a discrimination prohibited by the agreement of the contracting parties to GATT, including the United States and Great Britain and the Netherlands, in Part II, Article III, paragraph 1; that section 2800(a) (1) was enacted in 1939, prior to GATT, and, therefore, must be deemed modified by the provision of GATT, cited, which became effective January 1, 1948; that internal tax on imported underproof gin in bottles, as of the date this merchandise was entered, had been leveled down, by operation of GATT, so as to eliminate this indirect discrimination;

that such elimination has the effect of reducing internal tax on this merchandise to the tax applied indirectly to the like domestic product.

Much of this argument is plausible. It is not, however, the whole of the story.

In 1952, when this gin was entered, GATT contained an agreement, in Part II, Article III, not unlike the agreement which plaintiff cites. That citation is the original agreement. It was amended in 1948. In respect of the issue before us, the language of GATT in 1952 was even clearer and more precise than the original GATT agreement on which plaintiff seems to rely. The applicable provision is relevant to my opinion, and the exact language of the agreement is worth noting. It is as follows:

"Article III—National Treatment on Internal Taxation and Regulation

"1. The contracting parties recognize that *internal taxes* and other internal charges, and laws, regulations and requirements affecting the internal sale, offering for sale, purchase, transportation, distribution or use of products, and internal quantitative regulations requiring the mixture, processing or use of products in specified amounts or proportions, *should not be applied to imported or domestic products so as to afford protection to domestic production.*

"2. The products of the territory of any contracting party imported into the territory of any other contracting party *shall not be subject, directly or indirectly, to internal taxes* or other internal charges of any kind *in excess of those applied, directly or indirectly, to like domestic products. Moreover, no contracting party shall otherwise apply internal taxes or other internal charges to imported or domestic products in a manner contrary to the principles set forth in paragraph 1.*" Protocol Modifying Part II and Article XXVI of the General Agreement on Tariffs and Trade (T.

D. 52167), 62 Stat. 3680. [Emphasis supplied.]

Before considering, on the record here developed, whether or not the internal tax applied to this merchandise was in excess of the internal tax applied, indirectly, to the like domestic product, it would be well first to make certain that the cited GATT agreement is effective with respect to this tax. Plaintiff seems to assume that it is. That is not quite so simple as to permit of assumption.

It is clear that this GATT agreement did not take effect on January 1, 1948, so as to override the internal tax imposed by section 2800(a) (1) of the Revenue Act of 1939, or any amendment thereto, enacted prior to January 1, 1948. The terms upon which the United States recorded its accession to GATT state, in specific language, an important reservation in that respect. The United States (and, for that matter, Great Britain and the Netherlands also) were signatories to the Protocol of Provisional Application of the General Agreement on Tariffs and Trade, which contains the following:

> "1. The Governments of the * * * Kingdom of the Netherlands * * *, the United Kingdom of Great Britain * * *, and the United States of America, undertake, * * * to apply provisionally on and after January 1, 1948:
>
> *      *      *      *      *      *
>
> "(b) Part II of that Agreement *to the fullest extent not inconsistent with existing legislation.*" [Emphasis supplied.]

Whether the internal tax enacted by Congress as section 2800(a) (1) of the Internal Revenue Code, as modified by the Revenue Act of 1943 (58 Stat. 21), was or was not discriminatory against imported commercial underproof giñ in bottles, under the indirect GATT provision in Part II, Article III, paragraph 1, as plaintiff contends, the fact is that, by the express terms of accession to GATT, the United States limited its entire agreement in Part II, including Article III, paragraph 1, to future legislation. If there was discrimination in existing legislation, the GATT Part II provisions did not become effective on January 1, 1948, to the extent that those provisions were inconsistent with such legislation. Certainly the Revenue Acts of 1939 and 1943 were, on January 1, 1948, existing legislation within the meaning of the protocol reservation.

My view in this respect is fortified by the report of the United States Tariff Commission, prepared under the President's Executive Order No. 9832 of February 25, 1947, U.S. Code Cong Service 1947, p. 1994. This report was published in 1949. It is a comprehensive analysis of the trade agreement program, prepared by Presidential directive. The opinions expressed are entitled to respectful consideration, even though not binding on the courts. The Tariff Commission had closely followed the GATT negotiations and was in a favorable position to report the intended significance of negotiated provisions.

In the second part of its report (Report No. 160, Second Series), the Commission has something to say about Part II of GATT and, in particular, about Article III and the effects of the accession reservation above cited. On page 45, the report states as follows:

> "All signatories pledge themselves to extend national treatment to imports (art. III). *The provisions for national treatment with respect to taxation are broader than similar provisions of pre-Geneva agreements in that they include a commitment against the use of taxes not only on imported articles which are "like" domestic articles but also on those which are not "like" domestic articles but which are "directly competitive" with or "substitutable" for domestic products which are not similarly taxed. Existing protective taxes in this class may continue* but are subject to negotiation for their reduction or elimination. *However, no new or increased taxes*

*of this kind may be imposed.*
* * * " [Emphasis supplied.]

If this were the end of the matter, I would concur with the majority, although for reasons other than those stated in their opinion. But it is not the end of the matter.

The Revenue Act of 1951 increased the internal tax on spirits, under section 2800(a) (1) to $10.50 per proof gallon or wine gallon, as the case might be. This was new legislation. It was not legislation existing on January 1, 1948, within the meaning of the protocol reservation. Section 451(a), Revenue Act of 1951, 65 Stat. 524. This amendment took effect on November 1, 1951, a date antecedent to the entry of this merchandise.

The Revenue Act of 1951 did more, relevant to the situation before us, than merely to levy an increased tax under section 2800(a) (1). In express terms, Congress recognized the possibility that some of the enactments of the Revenue Act of 1951 might contravene treaty obligations of the United States and stated, in clear language, its intention that any amendment made by the Revenue Act of 1951 should not be applied where its application would be contrary to a treaty obligation. This is section 615 of the Revenue Act of 1951, 65 Stat. 569, 26 U.S.C. § 2800 note, entitled "Treaty Obligations," which reads as follows:

"No amendment made by this Act shall apply in any case where its application would be contrary to any treaty obligation of the United States."

The internal tax legislation enacted by Congress in 1951, section 451(a), is the most recent expression of congressional intention, as to tax rate, prior to entry of this merchandise. As such, and under established rules of construction, it would—but for section 615— prevail over the GATT agreement, even though in contravention of it. Ribas y Hijo v. United States, 194 U.S. 315, 24 S.Ct. 727, 48 L.Ed. 994.

It is the duty of the courts to construe the law and apply it. It is for Congress to make the law. Here, Congress has given the courts, in section 615, a guide to use in applying the amendments of the Revenue Act of 1951. Those amendments are not to apply in any case where application would be contrary to any treaty obligation of the United States.

The question is, is this such a case? In my opinion, it is.

It probably is not necessary to cite authority for the proposition that GATT, a multiparty trade agreement, has the legal force of a treaty and that its obligations are treaty obligations, within the scope of section 615 of the Revenue Act of 1951. The rule was laid down in B. Altman & Co. v. United States, 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894. The Supreme Court there had before it a commercial reciprocal agreement with France, negotiated under authority of the Tariff Act of 1897. The issue was whether plaintiff could appeal directly to the highest court, under the statute giving the right of direct appeal in cases involving construction of treaties. The Court held that the French commercial agreement was a treaty for purposes of such appeal. I am of opinion that GATT is a treaty, for purposes of section 615 of the Revenue Act of 1951, and that the obligations of the United States thereunder are treaty obligations.

Next, we should consider the language "shall not be subject, directly or indirectly," as used in Part II, Article III, paragraph 2, of GATT. Does the record before us show that an internal tax was laid on this imported merchandise which is in excess of the internal tax "indirectly" laid on like domestic merchandise?

"Indirectly" is an adverb. The adjective from which the adverb derives is, of course, "indirect." There are several shades of meaning indicated in the definition of that word. The one applicable here, as taken from Webster's New International Dictionary, second edition, is the following:

"indirect * * * *d* Not resulting directly from an act or cause,

952

but more or less remotely connected with, or growing out of, it; as, *indirect* results."

The Supreme Court had occasion to construe the meaning of "indirectly" in Hafemann v. Gross, 199 U.S. 342, 26 S.Ct. 80, 50 L.Ed. 220. The Court there said:

"* * * the statute expressly forbids the doing of the prohibited thing, either 'directly or indirectly;' and prohibits 'any agreement or contract,' in any way or manner whatsoever, by which the title to be derived from the government of the United States should inure, in whole or in part, to the benefit of any person except the pre-emptor. It is clear, to my mind, that the words 'directly or indirectly and in any manner' were obviously intended to embrace evasions and subterfuges by which the policy of the statute might be frustrated,—that is, the prohibition against giving to another person than the pre-emptor the benefit, in whole or in part, of the results of acquiring the land from the United States." (199 U.S. at page 350, 26 S.Ct. at page 84.)

It is not necessary to consider, as the Court did there, whether the tax consequences here result from "evasions and subterfuges." It is enough for us to consider whether the policy of GATT is frustrated by something not resulting *directly* from the tax under section 451 (a), but more or less remotely connected with, or growing out of it, that is, indirectly.

The record before us establishes that gin produced domestically is sold in the United States in competition with imported gin; that the commercial product is the same, whether domestic or foreign, that is, underproof gin in bottles; and that the internal tax, under section 451 (a) of the Revenue Act of 1951, on such imported gin is in excess of the internal tax indirectly paid by the like domestic product. This discrimination, by indirection, in application of internal tax to the imported gin, is contrary to the

treaty obligations of GATT. Congress, therefore, has directed (sec. 615 of the Revenue Act of 1951) that tax legislated by the Revenue Act of 1951 be applied in such a way as not to contravene the treaty obligations.

How the tax shall be applied, so as to give effect to congressional intention, is the remaining problem.

At the opening of trial in this and the companion case, protest 192782–K, plaintiff seemed aware that an important phase of its case was the proofs necessary for application of tax *in this case*, in such a way as to effectuate the intention of Congress. Counsel outlined to the court, in some detail, the separate proofs in the two cases which he proposed to introduce in support of alternate theories of application. (R. 17.) Largely for this reason, the two cases were not consolidated, although they were tried together.

Along the way, this distinction seems to have become blurred. Finally, it was all but obliterated when, on plaintiff's motion, the last of the separate evidence was cross-introduced into the record in the other case. (R. 141.)

Now, plaintiff seems to rely solely on the application of tax, both in this and the companion case, by substitution of the proof gallon, as tax base, for the wine gallon. Presumably to bolster this theory, plaintiff moved incorporation into the record in this and the companion case, of the record in Select Wines Company v. United States, 31 Cust.Ct. 310, Abstract 57648. Over defendant's objection, the late Judge Ekwall ordered incorporation. (R. 174.) The record in the Select Wines case is now before us as a part of the record in this case.

The Select Wines case was submitted on an agreed statement of facts. The court held that gin from the Virgin Islands was subject to internal tax "equivalent to" internal tax on the like domestic product. Equivalency was achieved by using for the Virgin Islands product the domestic proof gallon basis, instead of the wine gallon basis, as assessed.

I am not persuaded that the tax now before us should be so applied. It may be so. However, a tax "not in excess of" another tax, is not necessarily the same as a tax "equivalent to" that other tax. The record is lacking and the briefs are not helpful, in that respect.

The parties have had ample time for trial and for briefs. It may be that plaintiff should not now have the privilege of further developing the record, not having made its case. If this and the companion case were isolated cases, that view might seem to be persuasive. But these are not isolated cases.

It is a well-known fact that there are tens of thousands of cases pending before this court in which the claims of plaintiffs are generally similar to the claim of this plaintiff. To be sure, many of these cases relate to tax transactions before January 1, 1948, to which the GATT ban on indirect discrimination in internal tax against imported merchandise could not possibly apply. Others are cases in which the tax transaction fell within the period between January 1, 1948, and November 1, 1951, when this obligation under GATT was in suspense. In still others, where tax transactions occurred on and after November 1, 1951, it may well be that there was no like domestic product or, for other reasons of proof, indirect discrimination against the imported product will not be found.

Nonetheless, here, and in at least some of these other cases, it is important to determine how the congressional intention is to be effectuated, when indirect discrimination has been proven. Plaintiff's opening statement, on trial, suggested two possibilities. There may be others.

On the finding that the internal tax protested is contrary to the treaty obligation of GATT and that Congress expressed its intention that the tax should not be so applied as to be contrary to such obligation, and in order to give the parties an opportunity to develop proofs of record and to argue as to the method of applying tax in order to effectuate the intention of Congress, the case should be restored to an early calendar for that purpose.

At that time, plaintiff should, by appropriate proofs, identify those lots of the instant merchandise which are "simple" gin, and those (if any) in which rectification was part of the final process of reducing overproof gin in bulk to underproof gin in bottles.